UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---

In re:                                    Case No. 87-20142 *(rdd)*
                                          White Plains, New York
            TEXACO, INC.,                 May 28, 2010
                           *Debtor.*      10:40 a.m.

---

CORRECTED TRANSCRIPT OF TELEPHONE HEARING RE
87-20 142-ASH TEXACO, INC.; CASE CLOSED ON 03/05/2007
CHAPTER: 11 RE: DOC. 3869 - MOTION OF TEXACO INC.
FOR ORDER (I) REOPENING TEXACOS CHAPTER 11 CASE,
(II) ENFORCING CONFIRMATION ORDER DATED MARCH 23, 1988,
(III) FINDING RESPONDENTS IN CIVIL CONTEMPT OF 11 U.S.C.
§524(A)(2) AND CONFIRMATION ORDER, AND (IV) DIRECTING
RESPONDENTS TO DISMISS THEIR DISCHARGED CLAIMS
AGAINST TEXACO INC. IN THE LOUISIANA ACTIONS FILED
BY MARTIN J. BIENENSTOCK ON BEHALF OF TEXACO, INC.
BEFORE THE HONORABLE ROBERT D. DRAIN
UNITED STATES BANKRUPTCY JUDGE

A P P E A R A N C E S :

*For the Reorganized*      MARTIN J. BIENENSTOCK, ESQ.
*Debtor:*                  PHILIP ABELSON, ESQ.
                           HENRY RICARDO, ESQ.
                           Dewey & Leboeuf, LLP
                           1301 Avenue of the Americas
                           New York, New York 10019-6022
                           (212) 259-8530; (212) 259 6333 fax

*For the Respondents,*     LESLIE MARGARET KELLEHER, ESQ.
*Kling Realty et al:*      Caplin & Drysdale, LLP
                           One Thomas Circle
                           Washington, DC 20005
                           (202) 862-7819; (202)  429-3301 fax

*For the Respondents,*     WILLIAM E. STEFFES, ESQ.
*Kling Realty:*            Steffes, Vingiello & McKenzie, LLC
                           13702 Coursey Blvd., Bldg. 3,
                           Baton Rouge, Louisiana 70817
                           (225) 751-1751; (225) 751-1998 fax

*Transcription Service:*   AAA Electronic Sound Reporters
                           Electronicsound@court-transcripts.net
                           (888) 866-5135; (800) 860-5722 fax

*Proceedings recorded by electronic sound recording.*
*Transcript produced by transcription service.*

1          THE COURT:  Do I have the parties on the phone on the

2   Texaco matter?

3          MS. KELLEHER: Your Honor, it's Leslie Kelleher of

4   Caplin & Drysdale for the respondents Kling Realty, et al.

5          MR. STEFFES:  William Steffes, also on behalf -- Your

6   Honor, good morning -- on behalf of the Kling respondent.

7          MR. BIENENSTOCK:  Good morning, Your Honor.  Martin

8   Bienenstock, Phil Abelson and Henry Ricardo for Chevron.

9          THE COURT:  Okay.  I think that's -- those are the

10  relevant parties.  I want to thank the parties for their

11  supplemental briefing, and, as I think my chambers informed you,

12  I am prepared to rule at this point on Texaco's request for

13  relief, which is to enforce the confirmation order and bar date

14  order in this case and ultimately the discharge under Section

15  524(a) against the defendants or respondents in this case, who I

16  will refer to as the "Kling parties," although there are also

17  the Walets involved, as well, and the other entities listed in

18  the caption.

19          The Court has core jurisdiction over this adversary

20  proceeding, which is a proceeding to enforce the Court's prior

21  orders, as well as the discharge in the case, all of which gives

22  rise to jurisdiction under both 28 U.S.C. 1334(a) and is --

23  makes this proceeding a core proceeding under section 157 -- 28

24  U.S.C. 157(b).  See *In Re: Petrie Retail, Inc.* 304 F.3d. 223,

25  230 (2d. Cir 2002), and *In Re: Brooks Fashion Stores, Inc*. 124

1  B.R. 436 (Bankr. S.D.N.Y. 1991).

2         The parties have helpfully prepared a stipulation of

3  facts for a hearing dated January 21, 2010.  I pressed the

4  parties at oral argument on this matter whether there were any

5  materially disputed facts, and I think it's a fair summary to

6  say that both Mr. Bienenstock and Mr. Lockwood stated that, to

7  their knowledge, there weren't, but if something came up they

8  would reserve their rights to assert if something is disputed.

9         Based on my review of the exhibits and the transcript

10 of oral argument, as well as the briefing on this matter, I

11 don't believe that for purposes of my decision today there are

12 any material disputed facts, and the key facts are set forth in

13 the stipulation as well as the underlying documents and,

14 primarily, the parties' lease, which is Exhibit 12 in this

15 matter.

16        By way of background, Texaco's motion arises out of

17 two state court lawsuits filed by the respondents herein, the

18 Kling parties, who had leased land pursuant to an oil and gas

19 lease to Texaco in 1946.  That lease is attached, again, as

20 Exhibit 12 to one of the exhibits in the case.  The parties have

21 through legal action -- through assignments or changes in name -

22 changed, but the parties here are the successors to those

23 parties.

24        One of the lawsuits, Kling-1, *Kling Realty Company,*

25 *Inc. and Walet Planting Company v. Chevron USA, Inc.* (Chevron

1    being the successor to Texaco), case number 08-30043 is no

2    longer an issue, given the final and non-appealable judgment

3    that that lawsuit is barred by prescription, or the statute of

4    limitations under Louisiana law.

5          In the second lawsuit, however, *Kling Realty Company,*

6    *Inc. v. Chevron USA*, case number 110623, the Kling parties

7    continue to seek relief on both contract and tort claims (or

8    delict claims, in Louisiana parlance), arising out of -- that

9    were connected to Texaco's oil and gas production under the 1946

10   lease.  The respondents assert claims relating to alleged damage

11   to or for restoration of the portion of the acreage that was

12   subject to the 1946 lease referred to as Section 27; and that's

13   found at paragraph 6 of the stipulation of facts.

14         The lease provided that -- and this is in paragraph 2

15   of the lease -- "Subject to the other provisions herein

16   contained, this lease shall remain in force for up to five years

17   from this date and as long thereafter as either oil or gas is

18   produced from said land hereunder."

19         The parties acknowledge that the obligations under the

20   lease did not terminate until after the commencement of the

21   Chapter 11 case -- Texaco having filed for relief under Chapter

22   11 in this Court on April 12, 1987, and the final release under

23   the lease not having been executed and recorded until November

24   12, 1987.  Much of the respondents' argument is based upon that

25   fact.

1          There are other relevant provisions of the lease,

2     however.  First, the lease provides in paragraph 8 that the

3     lessee, just to quote, "may at any time and from time to time

4     during the lease, execute and deliver to lessor or place of

5     record a release covering all or any portion or portions of the

6     leased premises as to all or any specified mineral or minerals,

7     and thereupon shall be relieved of all obligations as to the

8     acreage surrendered or as to the acreage as to only the

9     particular mineral or minerals specified, as the case may be."

10          Finally, the 1946 lease also provides, at paragraph

11    10, that "the lessee shall without undue delay pay and reimburse

12    to the lessor any and all damages in full to lessor's lands,

13    crops, roads, and property caused by its operations either of

14    drilling wells or laying pipelines or in maintaining, operating

15    and also in constructing or using buildings, roads and other

16    works on the said land as permitted herein."

17          Consistent with paragraph 8 of the lease, which I

18    previously quoted in relevant part, Texaco, over the course of

19    its tenancy, used the right to release a portion of the leased

20    property or leased acreage a number of times.  It executed a

21    release as to Section 21 of the leased property in 1974; in June

22    -- on June 6, 1986, as recorded on June 13, 1986, it also

23    released a portion of the acreage on Section 27.  It also did so

24    in 1984.  See stipulation at paragraphs 7 and 10.

25          In each case, Texaco consistent, again, with paragraph

1   8, reserved and retained certain rights of way, easements,

2   servitudes and privileges for the operation of pipelines and

3   other facilities located over, upon and across Section 27, which

4   were necessary and convenient to lessee's continued operations

5   on the land retained under the 1946 lease.

6          With respect to the June 1986 release, this pertained

7   to an operating well in Section 26, Well Number 14.  The

8   operation of or production, excuse me, on Section 27 is agreed

9   to have terminated pre-bankruptcy, and the parties have agreed

10  that the last well on Section 27 was plugged and abandoned on

11  November 3, 1986 -- again, before Texaco commenced this Chapter

12  11 case.

13         The alleged harm or damage to the respondents'

14  property is agreed to have been to property on -- located on

15  Section 27, and it appears to me that all of that damage

16  occurred, or that the contamination or other causation of such

17  damage occurred, before the commencement of Texaco's Chapter 11

18  case.

19         However, the parties have also stipulated that after

20  the petition date Texaco continued to "access and perform work,

21  including pit closures, upon certain property once subject to

22  the 1946 lease, including Section 27," and that this activity

23  continued beyond the date that Texaco's plan was confirmed,

24  March 23, 1988.  Stipulation at paragraph 31.

25         The dispute in this case hinges upon whether, first,

1   the Kling parties, or the respondents, are bound by the bar date

2   order entered by this Court during the course of Texaco's

3   Chapter 11 case, establishing a March 15, 1988 bar date, and,

4   then, whether the failure of the respondents to file a claim

5   means that their claims in the Kling-2 action are now barred and

6   discharged by the bar date order and the confirmation order,

7   which was entered on March 23, 1988.

8           To answer that question, the Court has to navigate its

9   way through a number of issues which, given the expertise and

10  creativity of the parties, somewhat resemble a law school exam;

11  but, ultimately, the determination is relatively clear cut on

12  each of the issues.

13          Before turning to those issues, the Court should note

14  one other relevant date, which is October 9, 1991 -- which is

15  when the bankruptcy case, the Texaco bankruptcy case, was

16  closed, as well as note that although there was some uncertainty

17  about this in my mind going into the oral argument, it has now

18  been conceded at oral argument that each of the respondents, or

19  the Kling parties, received actual notice of the bar date, and,

20  of course, that they did not file a claim that asserted any

21  claim, let alone the claims set forth in Kling-2.

22          The first set of issues raised by the respondents is

23  whether, in fact, the respondents received appropriate notice of

24  the bar date and also whether, even if they did so receive --

25  did receive such notice, they should be relieved of the bar date

1    order under various equitable theories.  The respondents have

2    also requested that if the answer to those questions is that

3    they are bound by the bar date order, they be permitted to file

4    a late proof of claim under Bankruptcy Rule 9006.  I will

5    address that latter point at the end of this ruling.

6          As far as the former point, the Court has previously

7    upheld the bar date order, as applied to creditors in a similar

8    position to the respondents here, in this case.  And I believe

9    that those rulings are equally applicable here, notwithstanding

10   the argument made by the respondents, as would have been

11   applicable in the other Texaco rulings that were decided, that

12   this was a solvent debtor and that the bar date order and the

13   bar date itself, therefore, didn't play all of the traditional

14   roles that a bar date order would play in most Chapter 11 cases,

15   that involve insolvent debtors, and that the bar date itself was

16   established as a date only relatively shortly before

17   confirmation of Texaco's Chapter 11 plan.

18         None of those facts, I believe, negates the fact of

19   the bar date order, which was granted and entered by the Court

20   to set a deadline for the filing of general unsecured claims in

21   the case, and which I believe served an important purpose in the

22   case enabling parties in interest to evaluate the claims against

23   the estate prior to the confirmation hearing and entry of the

24   confirmation order.  That is, it was not an empty procedural

25   gambit.  See, for example, *In re Calpine, Inc.* 2007 U.S. Dist.

1  Lexis 86514, pages 14 through 15 (S.D.N.Y., Nov. 21, 2007), and

2  *First Fidelity Bank, N.A. v. Hooker Investments, Inc.* 937 F.2d.

3  823, 840 (2d. Cir. 1991).

4         The respondents further argue that in light of

5  Texaco's stated policy that it intended to treat its lessors and

6  leases as if the bankruptcy hadn't happened, they should be

7  excused from having to be bound by the order, notwithstanding

8  the order's terms, or, as a wrinkle on the foregoing, that the

9  notice of the bar date approved by the Court needed to identify

10  their particular claims and their obligation to file a claim

11  more explicitly than it did.

12         I believe, having reviewed the bar date notice and bar

13  date order, that the order sufficiently set forth notice of the

14  requirement to file a proof of claim for the types of claims

15  that are asserted in the Kling-2 action, and that additional

16  notice was not required.

17         I say that notwithstanding Texaco's communications to

18  lessors, because I believe that those communications should not

19  be read as obviating the need to file a claim, particularly in

20  respect of obligations that, under paragraphs 8 and 10 of the

21  1946 lease, would have been triggered pre-bankruptcy by either

22  the release of specific acreage or, under paragraph 10, a duty

23  to cure damages without undue delay.

24         The respondents rely heavily upon *In Re Texaco, Inc.*

25  254 536 -- I'm sorry, 254 B.R. 536 (Bankr. S.D.N.Y. 2000), also

1  referred to as the *LaFourche* case, L-a F-o-u-r-c-h-e.  However,

2  I believe that that case in fact supports Texaco's position

3  here, in that that case, in contrast to the other Texaco

4  decisions enforcing the bar date that I am about to cite, is

5  addressed to a different circumstance, which is the so-called

6  ride-through of unexpired leases, where there was no express

7  termination either by a clear rejection notice or under section

8  365 of the Bankruptcy Code or a termination of the lease or

9  expiration of the lease by its own terms.

10        In addition to that distinguishing factor which Judge

11  Hardin I believe makes clear in the *LaFourche* decision, the

12  applicability of the bar date to claims arising prepetition in

13  this case has been enforced a number of times, including in *In*

14  *Re Texaco, Inc.*  218 B.R. 1 (Bankr. S.D.N.Y. 1998), and *In Re*

15  *Texaco, Inc.* 182 B.R. 937 (Bankr. S.D.N.Y. 1995), which cases I

16  believe sufficiently dealt with the arguments made by the

17  respondents here with regard to the confusion they say they had

18  as to whether their claim was, in fact, a pre-bankruptcy claim

19  covered by the bar date order or a post-bankruptcy claim which

20  would ride through the bankruptcy case instead.  See also, in

21  respect of the notice issues, *Jones v. Chemtron Corp.* 212 F.3d

22  199 (3d. Cir. 2000).

23        The Kling parties also argue that Texaco should be

24  estopped from relying on the bar date under the doctrine of

25  laches, given that the Kling-2 case, which was filed on May 15,

1  2009 -- I am sorry, given that Texaco appears to have first

2  raised the bar date issue and the discharge issue in Kling-2 on

3  May 15, 2009, approximately 20 months after the commencement of

4  Kling-2, and that in the intervening period the parties -- the

5  Kling parties -- incurred thousands of dollars of fees and costs

6  in the preliminary litigation of Kling-2.

7        They also note that when the answer was due in Kling-

8  2, Louisiana law required that a discharge in bankruptcy be

9  raised as an affirmative defense.  See Louisiana Rules of Civil

10  Procedure Annot. Article 1005 (2005).  Notwithstanding that

11  fact, however, I believe that neither waiver nor laches apply

12  here, given, primarily, the fact that under the Bankruptcy Code

13  the discharge, which in a Chapter 11 case benefits not only the

14  debtor but the debtor's creditors (and, in a solvent case the

15  debtor's shareholders) cannot be waived by conduct or even an

16  agreement, without proper approval under section 524 of the

17  Bankruptcy Code.  See *In re Gurrola,* 328 B.R. 158 (9th Cir. BAP

18  2005).  I believe the same analysis would apply to laches, as

19  has been so held at 323 B.R. 802 (10th Cir. BAP 2005), in *In Re*

20  *Pritner*.

21        In any event, laches is an equitable doctrine which

22  applies when a party unreasonably delays in asserting a right

23  which, taken together with a lapse of time and other

24  circumstances causes prejudice to an adverse party and operates

25  as a bar in a court of equity.  *In Re DeArakie*, D-e A-r-a-k-i-e,

1    199 B.R. 821, 827 (Bankr. S.D.N.Y. 1996).  Here, notwithstanding

2    the costs that the Kling parties have incurred between the date

3    that they commenced Kling-2 and the date that Texaco sought to

4    enforce this Court's orders and the discharge, two facts cut

5    against the application of laches, even if it is permitted to

6    apply notwithstanding section 524.

7         First, in their complaint, the Kling parties asserted

8    they were not seeking relief in violation of the discharge.

9    Second, as is evident by the development, even during oral

10   argument, of the matter before the Court, the nature of and

11   theory behind the Kling parties' claims has developed over time.

12   Therefore, I believe that it is not inequitable to permit Texaco

13   to have asserted the discharge and the bar date when it did,

14   after it became clear that the type of claim -- at least one of

15   the types of claims -- asserted by the respondents would clearly

16   be within the ambit of the bar date order and the discharge.

17        I also do not believe that the doctrine of judicial

18   estoppel would apply here since the plaintiff here, Texaco, has

19   not both asserted and prevailed on a contrary position in

20   another matter than the position it is asserting here with

21   respect to the applicability of the bar date order and the

22   discharge.  See *In Re Perry H. Koplik & Sons, Inc.* 357 B.R. 231

23   (Bankr. S.D.N.Y. 2006), and *In Re I. Appel Corp.* 300 B.R. 564

24   (Bankr. S.D.N.Y. 2003), as well as *New Hampshire v. Maine*, 532

25   U.S. 742, 749 (2001).

1    Ultimately, the doctrine of judicial estoppel is

2  intended to prevent a party from "playing fast and loose with

3  the courts."  *In Re Galerie Des Monnaies of Geneva, Ltd.*, 62

4  B.R. 224, 226 (S.D.N.Y. 1986), and *In Re Perry H. Koplik & Sons,*

5  *Inc.* 357 B.R. 231, 245 (Bankr. S.D.N.Y. 2006).  I do not believe

6  that that is the case here with regard to the applicability of

7  the bar date order and the discharge.

8    Therefore, I turn to the respondents' argument that

9  the claims they are asserting are not covered by the bar date

10 order and, therefore, would not be barred or discharged at this

11 time.

12    The claims that are being asserted by the respondents

13 here fall, according to the respondents, into two categories:

14 prepetition claims and postpetition claims.  By its terms, the

15 plan would pay all administrative claims, that is postpetition

16 claims, in full in the ordinary course.

17    And they will be: to the extent that it is asserted by

18 the respondents that they have administrative claims, those

19 claims will be paid as dealt with in a moment.  However, it is

20 clear to me that to the extent that the claims in Kling-2 arise

21 prepetition, those claims would, in fact, be barred by the bar

22 date order and discharged.

23    Based upon the facts in this case, it is clear to me

24 that claims arising under either paragraph 8 or paragraph 10 of

25 the 1946 lease would be, in fact, prepetition claims.

1    First, the lease itself is obviously a prepetition

2    agreement.  Secondly, the conduct giving rise to the conditions

3    that require cleanup occurred prepetition. And, thirdly, the

4    obligation itself (although this is not required for making a

5    claim a prepetition claim) appears to have become actual

6    prepetition with the release of the production property

7    prepetition and the closing and cease -- cessation of the

8    production prepetition in Section 27, which as I understand it

9    is the basis for the claim in Kling-2.

10    As I just noted, that latter fact, i.e., the fact that

11    the claim ceased to be contingent prepetition, is not a

12    requirement for a claim to be a prepetition claim given the

13    broad definition of "claim" in section 101(5) of the Bankruptcy

14    Code.  As noted by the Second Circuit, "A claim arises for

15    purposes of bankruptcy when 'the relationship between the debtor

16    and creditor contained all of the elements necessary to give

17    rise to a legal obligation under the relevant non-bankruptcy

18    law.'"  In re Duplan Corporation, 212 F.3d 144, 151 (2d. Cir.

19    2000), quoting *In Re Chateaugay Corp.*, 53 F.3d 478, 497 (2d.

20    Cir.), cert. denied 516 U.S. 913 (2000) -- I'm sorry, (1995).

21    See also *In Re: Manville Forest Products Corp.* 209 F.3d 125 (2d.

22    Cir. 2000), and *In Re: Texaco, Inc.* 218 B.R. 1 (Bankr. S.D.N.Y.

23    1990).

24    I believe that the respondents pretty much

25    acknowledged this hurdle, at least at oral argument, when the

1   focus of their opposition to Texaco's request for relief here

2   turned to asserting, or emphasized the assertion, that the claim

3   or claims as asserted in the Kling-2 case are in fact

4   administrative claims under section 503(b)(1) of the Bankruptcy

5   Code and, therefore, wouldn't be covered by the bar date order

6   in any event but, rather, would be governed by Texaco's Chapter

7   11 plan, which required that such claims be paid in the ordinary

8   course in full.

9          Section 503(b)(1) of the Bankruptcy Code provides a

10  priority for the "actual necessary costs and expenses of

11  preserving the estate, including wages, salaries or commission

12  for services rendered after the commencement of the case."

13  Under section 507(a)(1), Those expenses are accorded a first

14  priority.  That priority is based on the premise that the

15  operation of the business by the debtor in possession benefits

16  prepetition creditors.  Therefore, any claims that result from

17  the operation are entitled to payment prior to payment to

18  creditors for whose benefit the continued operation of the

19  business was allowed.  *In re Enron Corp.* 300 B.R. 201, 207

20  (Bankr. S.D.N.Y. 2003).  As noted by the *Enron* court, the focus

21  of this section is to prevent unjust enrichment of the estate,

22  not to compensate the creditor for its loss.  <u>Id</u>. at -- again at

23  207.

24          It is clear that in evaluating whether a creditor has

25  carried its burden to show that it has an administrative claim,

1  the court should narrowly construe the right to such a claim.

2  That is because every dollar paid in full to an administrative

3  creditor reduces the amount of so-called tiny bankruptcy dollars

4  paid to general unsecured creditors.  See *Howard Delivery*

5  *Service, Inc. v. Zurich American Insurance Co.*, 126 S. Ct. 2105

6  (2006), and *In Re: Bethlehem Steel Corp.*, 479 F.3d 167 172 (2d.

7  Cir. 2007).

8         In light of the forgoing, the Second Circuit has

9  adopted a definition that is difficult to meet.  An expense is

10  administrative under section 503(b)(1) only if it arises out of

11  a transaction between the creditor and the trustee or debtor in

12  possession, and only to the extent that the consideration

13  supporting the claimant's right to payment was both supplied to

14  and beneficial to the debtor in possession in the operation of

15  the business.  *In Re: Bethlehem Steel*, 479 F.3d at 172, quoting

16  *Trustees of Amalgamated Insurance Fund v. McFarlin's Inc.*, 789

17  F.2d 98, 101 (2d. Cir. 1986).  That is the case with respect to

18  all matters other than postpetition tort matters.  Before

19  turning to those types of administrative claims, it should be

20  noted, therefore, that a debt is not entitled to an

21  administrative priority simply because the right to payment

22  arises after the debtor in possession begins managing the estate

23  but, rather, depends upon the date of the consideration

24  supporting the claimant's right to receive it.  McFarlin's, 789

25  F.2d at 101.

1     In addition, the benefit will set the measure of the

2     claim, since it's clear from the prior quote that the claim will

3     be allowed only to the extent that the consideration supporting

4     the claimant's right to payment was both supplied and beneficial

5     to the debtor in possession.  Also, the benefit must not be

6     speculative but, instead, must have a present value at the time

7     it was conferred, even if, thereafter, according to the Second

8     Circuit, it had turned to dust, in light of the ultimate failure

9     to rehabilitate or sell the business.  See *Nostas Associates v.*

10    *Costich* (*In re Klein Sleep Products, Inc.*), 78 F.3d 18, 26 (2d.

11    Cir. 1996), and *In Re: Refco, Inc.* 2008 WL 140956 at *7-8

12    (S.D.N.Y. January 14, 2008), *aff'd*, 321 Fed. Appx. 12 (2d. Cir.

13    2009).

14    Given the forgoing, it appears to me that the

15    respondents' contract claims in Kling-2 would not constitute

16    administrative claims: not only are they premised on a

17    prepetition contract, but they are also premised upon activity

18    giving rise to a cleanup obligation that occurred prepetition.

19    The respondents counter by saying that the debtor

20    maintained an interest in Section 27 during the postpetition

21    period with respect to rights of way, pipelines and easements

22    that related to Section 26 and the well for which some income

23    *was* produced thereon, and that that section -- that is Section

24    26 -- was not released until the postpetition period.  However,

25    they have not asserted any cleanup obligation that was caused by

1   conduct of the debtor on Section 27 relating to the postpetition

2   period.

3          Moreover, it appears clear to me that the debtor's

4   obligation under the parties' contract to the extent that the

5   contract continued during the postpetition period arose

6   prepetition.  Again I return to Section -- paragraph 8, excuse

7   me, and paragraph 10 of the lease.  Paragraph 8 of the lease

8   provides that the lessee shall be relieved of all obligations as

9   to the acreage surrendered or as to the acreage -- as to all of

10  the particular minerals specified, as the case may be.  The

11  acreage surrendered prepetition as I understand it, is the

12  acreage upon which the cleanup obligation is asserted.

13         More importantly, the lease provides an obligation to

14  clean up that modifies paragraph 8, which is found in paragraph

15  10; but again I believe that obligation was triggered by its

16  plain terms when the property was surrendered.  That section

17  provides "the lessee shall without undue delay pay and reimburse

18  the lessor any and all damages in full to the lessor's lands,

19  crops, roads and property caused by its operations."

20         The term "undue delay" does not appear to me to be a

21  term of art.  And again without there being an assertion that

22  the lessee was somehow prohibited from paying and reimbursing to

23  the lessor any and all damages upon its release of the land in

24  Section 27, it appears to me that the parties agreed by

25  paragraph 10 of the lease that that is when Texaco's obligation

1    to pay the respondents their damages caused by its operations

2    would have arisen, at the latest.

3         It is asserted by the respondents that there is a

4    separate obligation under Louisiana law that arises only upon

5    the termination of the lease, i.e., the full lease as opposed to

6    release of the property under a lease, to restore the property.

7    And I believe that is the case when the lease itself has not

8    dealt with, by the agreement of the parties, the parties' rights

9    in respect of damages caused by one to the other.

10        Louisiana, not surprisingly, recognizes freedom of

11   contract.  Their agreement is the law as between the parties,

12   *Corbello v. Iowa Production* 857 So.2d. 686, 693 (La. 2003).  And

13   not surprisingly also, the purpose of contract interpretation is

14   to determine the common intent of the parties, and the meaning

15   and intent of the parties to a written instrument should be

16   determined within the four corners of the document and its terms

17   should not be explained or contradicted by extrinsic evidence.

18   *Id.*

19        When a contract is subject to interpretation of the

20   four corners of the instrument without the necessity of

21   extrinsic evidence that interpretation is a matter of law, and

22   when the words of the contract are clear and explicit and lead

23   to no uncertain consequences, no further interpretation need be

24   made into the party's intent.  Thus, again, the parties are free

25   to contract for any object that is lawful, possible and

1    determined or determinable.

2          Here, I believe, that's just what the parties did.

3    The cases cited by the respondents for the proposition that a

4    remediation obligation -- or a restoration obligation, excuse

5    me, arises only upon termination of the contract, deal with

6    situations where the parties did not specify a separate

7    obligation and therefore were dealing with, simply, issues under

8    Louisiana mineral statute and civil statute law.

9          I believe this is clearly or most clearly set forth in

10   the back and forth between the dissenters and the court in *In*

11   *Re: Terrebonne Parish School Board v. Castex Energy Inc.* 893

12   So.2d. 789 (La. 2005), where the language that appears in the

13   lease did not appear but the Court was, instead, dealing with

14   implied obligations under Louisiana law. That was also the fact

15   pattern in *Corbello v. Iowa Production*, 857 So. 686 (La. 2003).

16         So, even under the broadest approach, which is the

17   approach that the respondents take, to finding an administrative

18   claim, wherever there is some postpetition benefit because of a

19   continued relationship between the parties, I don't believe that

20   the amount of the claim, or, more importantly, the underlying

21   basis for the claim, which is prepetition activity, under the

22   parties' agreement would support the allowance of an

23   administrative claim here.

24         Moreover, I believe there is also considerable merit

25   to the view that, with the release of the property where the

1  cleanup needs to be done, there was no ongoing postpetition

2  cleanup obligation simply because other property was retained.

3  I believe this is made clear in a series of cases that deal with

4  tenants' cleanup obligations after the rejection or termination

5  of a lease, where the courts have uniformly held that such

6  cleanup obligations do not give rise to an administrative claim

7  even where, in certain instances, the debtor chose not to reject

8  the lease and, therefore, end the relationship until a

9  considerable time postpetition.  See *In Re: Ames Department*

10 *Stores, Inc.*, 306 B.R. 43 (Bankr. SDNY 2004), which relied upon

11 *In Re: Unidigital, Inc.*, 262 B.R. 283 (Bankr. D Del. 2001), and

12 *In Re: National Refractories and Minerals Corp.*, 297 B.R. 614

13 (Bankr. N.D. Cal. 2003).

14         In response to those types of cases, as well as

15 *Bethlehem Steel* and *McFarlin's*, the respondents essentially rely

16 upon a trilogy of Third Circuit -- I'm sorry, of Second Circuit

17 cases that provided administrative claim status for severance

18 claims for employees with severance agreements who were

19 terminated postpetition, including and most importantly, *In Re:*

20 *Straus Duparquet*, 386 F.2d 649 (2d Cir. 1967).  The respondents

21 are correct that the Second Circuit has not overturned those

22 precedents.  However, it has severely narrowed them in the

23 *Bethlehem Steel* case that I previously cited, in which the Court

24 said "A payment may be entitled a priority under *Straus*

25 *Duparquet* even if it operates differently from the payment at

1    issue there, if it provides a new benefit at termination that

2    employees would not otherwise receive.  The key inquiry is

3    whether the payment is a new benefit earned at termination or

4    instead an acceleration of benefits to which the employee was

5    previously entitled.  The former is an administrative expense of

6    the debtor-in-possession, while the latter is not."

7            As I previously noted, the right here asserted by the

8    respondents arose pre-bankruptcy, under the lease and in

9    particular at paragraphs 8 and 10, under these facts.  Those

10   paragraphs modified the common law -- or not common law, the

11   code law provisions as interpreted by the Louisiana courts --

12   that, in the absence of an applicable contractual provision,

13   give the lessor a restoration right upon only the termination in

14   full of the lease.

15           Obviously, in the normal case such a common law or

16   code law provision would operate to the detriment of lessors

17   since a lessee could drag out its obligation under a long term

18   lease until all sections would be terminated.  Here, where the

19   parties anticipated the termination of individual sections or

20   acreage within individual sections well before the termination

21   of the lease, it's entirely logical that they would contract to

22   accelerate the obligation of the lessee to pay for damages

23   caused by its operations.  And therefore, again, consistent with

24   all of the administrative claim case law that I've cited, that

25   obligation being accelerated by the parties arose postpetition -

1  - I'm sorry, prepetition, and, therefore, would be merely a

2  general unsecured claim.

3        I have reviewed the one other case cited by the

4  respondents on this point, which is *In Re: Penn Traffic Company*,

5  524 F.3d. 373 (2d. Cir. 2008), and, frankly, I simply don't see

6  its relevance given that the termination in that case was by the

7  non-debtor party and the case did not really deal with

8  administrative claims but, rather, with what was an executory

9  contract and what isn't an executory contract.

10        That leaves two remaining issues.  As I noted, the

11  requirements for the allowability of an administrative claim

12  under *Bethlehem Steel* would bar a claim where the parties'

13  relationship is contractual.  There's a slightly different

14  approach where the parties' relationship is based on a tort

15  claim, following *Reading Co. v. Brown*, 391 US 471 (1968).  It's

16  well established that "damages resulting from the negligence of

17  a receiver" [you could substitute in here a debtor-in-

18  possession] "during the postpetition period give rise to

19  administrative expense claims." <u>Id</u>. at 485.  In doing so, the

20  Court held, "an involuntary creditor of the estate suffers grave

21  financial injury as a result of the negligence of the bankrupt's

22  estate and therefore it is natural and just to afford such

23  claims priority and distribution even though such claims do not

24  arise from transactions that were necessary to preserve or

25  rehabilitate the estate." <u>Id</u>. at pages 477 and 482.

1    I believe, however, that the mere label of a tort

2  claim, as placed on the alternative claim asserted in the Kling-

3  2 action, does not by itself give rise to an administrative

4  claim here under *Reading Co. v. Brown* and the case law that has

5  followed it.  The tort claim that is asserted here is a "delict"

6  claim, under the Louisiana parlance, that is premised upon the

7  fault incurred by Texaco in breaching its contract.  See

8  Louisiana Code -- I'm sorry, Civil Code Annotated, Article

9  2315(a), and *Cooper v. Louisiana Department of Public Works*, 870

10 So.2d. 315, 332 (La. A.D. 3d Cir. 2004).

11   Here, in that sense, and contrary to the logic of

12 *Reading Co. v. Brown*, the respondents are not involuntary

13 creditors.  Their tort rights are premised upon their

14 contractual relationship and the breach of that relationship or

15 the asserted breach of that relationship by Texaco.  Since that

16 breach occurred, as I have already found -- if it occurred --

17 prepetition, I do not believe that the holding of *Reading Co. v.*

18 *Brown* would be applicable here.

19   I also note that the respondents have been careful to

20 state, as they did at oral argument, that they're not asserting

21 a right based upon a breach of applicable regulations or statute

22 that would require Texaco to act at the direction of the

23 Louisiana environmental regulatory authorities, and they're not

24 asserting that Texaco placed or caused environmental

25 contamination on the leased property postpetition.  Rather, the

1  administrative claim is premised upon the continuing

2  lessor/lessee relationship with respect to property that

3  apparently was not contaminated and does not give rise to a

4  cleanup obligation or a damage claim, but that occurred after

5  the commencement of Texaco's Chapter 11 case.  That

6  relationship, as I have said, however, would not give rise to a

7  postpetition administrative expense claim.

8          Finally, the claimants -- I'm sorry, the respondents,

9  contend that Texaco had an obligation with regard to all of

10  Section 27 under section 365(d)(3) of the Bankruptcy Code

11  because that -- the lease in respect of that section did not

12  completely get released in the prepetition releases.  If that

13  were so, then Texaco would have an administrative claim against

14  it under that section, which provides that "The trustee shall

15  timely perform all obligations of the debtor [with irrelevant

16  exceptions] arising from and after the order for relief under

17  any expired lease of non-residential real property until such

18  lease is assumed or rejected."

19          Texaco contends that this provision does not apply to

20  a Louisiana oil and gas lease based upon case law, including a

21  case involving Texaco, but primarily upon *In Re: Hamm Consulting*

22  *Company/William Lagnion MJV*, 143 B.R. 71 (Bankr. W.D. La. 1992),

23  which construed, among other things, a decision by the District

24  Court for the Middle District of Louisiana in *Texaco, Inc. v.*

25  *Louisiana Land and Exploration Co.,* 136 B.R. 658 (M.D. La.

1    1992).  I believe that those decisions are persuasive and that

2    this type of real property relationship would <u>not</u> constitute a

3    non-residential real property lease for purposes of section

4    362(d)(3).

5            However, I believe there's another reason also that

6    this section does not apply, which is that, first, the

7    obligations under the lease are those that I have already

8    specified, all of which arose prepetition, so that even to the

9    extent that the release of the specific land where the

10   obligation appears prepetition would not render that portion of

11   the lease "unexpired", to use the term in section 365(d)(3), the

12   obligations that would remain are those set forth in paragraphs

13   8 and 10, and those are prepetition obligations as far as the

14   assertion that any claims derive from them.  See generally the

15   discussion of 365(d)(3) in *In Re: Ames Department Stores, Inc.*,

16   306 B.R. 43 (Bankr. S.D.N.Y. 2004).

17           For those reasons, I conclude that the respondents

18   here have only asserted in the Kling-2 case prepetition general

19   unsecured claims and, therefore, that those claims are subject

20   to the bar date order and the discharge and, accordingly, may

21   not be pursued at this time.

22           That leaves the respondents' request that they be

23   relieved of the bar date and be allowed to file, late, a proof

24   of claim for such claims.  If I were to grant that motion, the

25   claims would be -- to the extent that they are determined by the

1  Louisiana court or another trier of fact to be valid -- those

2  claims would be paid in full.

3        I have reviewed that request under Bankruptcy Rule

4  9006(b)(1), which permits a claimant to file a late proof of

5  claim if the failure to submit a timely proof of claim was due

6  to "excusable neglect."  The burden of proving excusable neglect

7  is on the respondents here.  *In Re: R.H. Macy and Co.*, 161 B.R.

8  355, 360 (Bankr. S.D.N.Y. 1993).

9        The Supreme Court has developed a two-step test for

10 determining whether a late filing was due to excusable neglect,

11 in *Pioneer Investment Services, Co. v. Brunswick Associates,*

12 *Limited Partnership*, 507 U.S. 380 (1993).  First, the movant

13 must show that its failure to file a timely claim constituted

14 "neglect", as opposed to a knowing decision, neglect generally

15 being attributed to a movant's inadvertence, mistake or

16 carelessness.  Id. at 387-88.  After establishing neglect, as

17 opposed to willfulness or knowledge of the bar date, and the

18 failure to show why any unknowing basis for neglecting – and, I

19 am sorry, and the failure to show any unknowing basis for

20 neglecting it, the movant must show by a preponderance of the

21 evidence that the neglect was "excusable."  That analysis is to

22 be undertaken on a case-by-case basis that is based on the

23 particular facts of the case, although the court is to be guided

24 by, and make the determination balancing, the following factors:

25 (a) the danger of prejudice to the debtor, (b) the length of the

1  delay and whether or not it would impact the case, (c) the

2  reason for the delay, in particular whether the delay was within

3  the control of the movant, and (d) whether the movant acted in

4  good faith.  *Id.* at 395.  However, "Inadvertence, ignorance of

5  the rules or mistake construing the rules do not usually

6  constitute excusable neglect." *Midland Cogeneration Venture LP*

7  *v. Enron Corp.* (*In Re: Enron Corp.*), 419 F.3d 115, 126 (2d. Cir.

8  2005), citing *Pioneer*, 507 U.S. at 392.

9          In the *Midland* case, the Second Circuit has stated "We

10  have taken a hard line in applying the *Pioneer* test.  In a

11  typical case, three of the *Pioneer* factors, the length of the

12  delay, the danger of prejudice and the movant's good faith,

13  usually weigh in favor of the party seeking the extension.  We

14  have noted, though, that we and other circuits have focused on

15  the third factor, the reason for the delay, including whether it

16  was within the reasonable control of the movant.  And we

17  cautioned that the equities will rarely, if ever, favor a party

18  who fails to follow the clear dictates of a court rule, and that

19  where the rule is entirely clear, we continue to expect that a

20  party claiming excusable neglect will in the ordinary course

21  lose under the *Pioneer* test." *Id.* at 122-23.

22          See also *In Re: Musicland Holding Corp.* 2006 Bankr.

23  LEXIS 3315 at pages 10-11 (Bankr. S.D.N.Y. 2006), in which Chief

24  Bankruptcy Judge Bernstein, citing *Midland*, stated that the

25  Second Circuit focuses on the reason for the delay in

1    determining excusable neglect under *Pioneer* and that "the other

2    factors are relevant only in close cases."

3          Here, I have considered the facts and conclude that

4    there is not a basis for permitting the late filing of a proof

5    of claim.  First, it appears to me that the late filing of the

6    claim was within the reasonable control of the respondents.

7    They have argued that that they were confused by the fact that

8    Texaco's plan paid creditors, including unsecured creditors, in

9    full, and, further, that they felt that they might have had an

10   administrative claim, instead of a prepetition general unsecured

11   claim, as I have just determined.

12          Third, they've stated that they were confused by an

13   earlier communication from Texaco that indicated that Texaco

14   intended to treat its lessors essentially as if the bankruptcy

15   had not happened.

16          However, I have reviewed the bar date notice, the

17   plan, and that communication; and I conclude that a reasonable

18   claimant would in making a similar review conclude that although

19   unsecured claims, like administrative claims, would be paid in

20   full, if there was any reasonable doubt as to whether the claim

21   was administrative or unsecured it would have to file a proof of

22   claim on a timely basis in order to have that claim be allowed

23   as a general unsecured claim.

24          Moreover, I do not believe that the communication by

25   Texaco would have reasonably led the respondents to think that

1    they would not have to comply with the subsequently received bar

2    date notice.  Rather, in order to be treated and paid in full, I

3    believe it's clear from the notice that they would have to file

4    the timely proof of claim.  There's nothing in the wording of

5    the notice, the bar date order, or the plan (which, frankly,

6    follow the general form which is essentially boilerplate for

7    these types of notices) that would have indicated otherwise.

8          Moreover, the respondents have a long history of

9    noting claims and seeking to enforce claims for damages to the

10   property caused by Texaco, including sending notices through

11   representatives and lawyers prepetition.  Therefore, it's safe

12   to assume not only from that history as well as the fact that

13   they were dealing with an oil and gas lease (where obviously

14   there's a potential for at least contingent prepetition claims

15   caused by the lessee's use of the property for its intended

16   purposes) that they would have been aware that they would have

17   had a unsecured prepetition claim, and, therefore, the failure

18   to have filed such a claim was within their control.

19         Moreover, I don't believe the other factors suggest

20   that this is a particularly close case, even in the -- if one

21   were to weigh the other factors.  The delay here is obviously

22   substantial, over 22 years.  Moreover, the delay follows the

23   effective date of Texaco's plan and the closing of the case

24   which occurred in 1991.

25         The respondents make the point that Texaco had, and

1   Chevron has, enough money to pay unsecured creditors in full and

2   therefore there's no prejudice to the creditors.  However, in a

3   solvent Chapter 11 case, the fulcrum claim moves down to the

4   equity holders.  Here, Texaco emerged as a publicly held company

5   from Chapter 11.  The existence of this claim, which is a very

6   large claim as asserted, if it existed, would have affected

7   those holders.  Moreover, Chevron purchased Texaco in reasonable

8   reliance upon the bar date and the discharge, and the existence

9   of this claim would, after that purchase and obviously well

10  after the issuance of the discharge, prejudice it, as well.

11          So, while I believe that the respondents have acted in

12  good faith here, I don't believe that they've established their

13  burden, which is a heavy one given that I believe that the late

14  filing was well within their control, to have the claim be

15  permitted to be filed late.  So, for those reasons, I will deny

16  that request by the respondents.

17          The relief sought at this point seeks merely to

18  enforce the discharge injunction and the bar date order, and I

19  believe that's fully appropriate here for the reasons that I

20  have stated.  There's no issue here before me on any damages

21  suffered by Texaco or Chevron -- the plaintiff here being quite

22  candid that its goal is simply to stop the Kling-2 lawsuit from

23  proceeding in violation of the Court's orders and the discharge.

24          So I will grant that relief and I request that, Mr.

25  Bienenstock, you submit an order consistent with my ruling.  You

1    do not have to settle that order on the respondents, but you

2    should email it to them before you send it to me so that they

3    would have a chance to review it to determine whether it's

4    inconsistent with my ruling.

5            This has been a lengthy ruling.  As I noted, the

6    issues raised by the parties probably could serve as a law

7    school exam.  It was an oral ruling, and with oral rulings of

8    this nature, I generally reserve the right to go over the

9    transcript and edit it, not only for typos and mis-citations or

10   misspellings of citations but also if I feel that I should have

11   said something more elegantly or that I should have added

12   something, I will do that.  If I do that, I will file the

13   corrected bench ruling and it will be a separate document in the

14   case.  It won't be the transcript anymore of my ruling.  It will

15   be the ruling.  And I may do that here, given the length of this

16   bench ruling; but the holding won't change.  So, again, Mr.

17   Bienenstock, you should submit an order consistent with the

18   ruling.

19           MR. BIENENSTOCK:  Thank you, Your Honor.

20           THE COURT:  Okay.  Thank you.

21           MR. STEFFES:  Thank you, Your Honor.

22           THE COURT:  Okay.

23           MS. KELLEHER:  Your Honor?

24           THE COURT:  Yes.

25           MS. KELLEHER:  This is Leslie Kelleher for respondents

1  Kling, et al.

2           THE COURT:  Yes.

3           MS. KELLEHER:  We appreciate the thoughtfulness of

4  your ruling but I would ask that we be allowed to submit

5  supplemental briefs on the late filed issue as our understanding

6  was that the opinion would deal primarily with the issue of

7  administrative claims and Louisiana law and that the scope of

8  the ruling would be with respect to what was discharged or not.

9           THE COURT:  Well, the supplemental briefing covered

10 that issue but as I -- I went back and read the transcript last

11 night, as I took it, the parties put before me the 9006 issue.

12 You can move under Rule 59, Bankruptcy Rule 9023, if you think

13 there's something that should have been in the record on this

14 that wasn't, but I think the whole thing was in front of me.

15          MS. KELLEHER:  Thank you.

16          THE COURT:  If I am wrong about that, you can make

17 your motion, but at least you have the benefit of my thoughts on

18 it even if I did misconstrue the posture of this and what you

19 would have to show if you were going to prevail.

20          MS. KELLEHER:  Thank you.

21          THE COURT:  Okay.  Thank you.

22          (This hearing concluded at 12:08:12.)

23                         - o0o -

24

1                           CERTIFICATION

2

3            I, Linda Ferrara, certify that the foregoing is a

4    correct transcript from the official electronic sound recording

5    of the proceedings in the above-entitled matter.

6    Dated:  June 1, 2010

7

8                              _____

9                              Signature of Approved Transcriber

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25