**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

<u>**FOR PUBLICATION**</u>

_____

In re:

TEXACO, INC., et al.,

Reorganized Debtor.

_____

)
)
)
)
)
)
)
)

Chapter 11

Case No. 87-20142 (DSJ)

**DECISION AND ORDER GRANTING MOTION OF REORGANIZED TEXACO INC.
TO REOPEN THE DEBTORS' BANKRUPTCY CASES & DENYING MOTION OF
REORGANIZED TEXACO FOR ENTRY OF AN ORDER ENFORCING THE
DISCHARGE AND INJUNCTION IN THE CONFIRMATION ORDER, PLAN, AND
<u>BAR DATE ORDER</u>**

This decision and order (this "**Decision**") resolves two related motions by successors to the reorganized debtor ("**Reorganized Texaco**" or "**Debtor**"). Debtor asks the Court to reopen the long-closed, 37-year-old bankruptcy case of the former Texaco Inc. and to hold that this Court's confirmation order and the confirmed plan's discharge and injunction provisions bar Louisiana parishes from pursuing recoveries for alleged environmental degradation and land loss stemming from decades of Texaco activities in coastal areas of Louisiana. The present motions arise from forty-two lawsuits against various oil and gas companies of which roughly twenty-two list Reorganized Texaco and/or its affiliates as defendants. The suits (the "**Louisiana Lawsuits**") have been filed by the Parishes of Cameron, Jefferson, Plaquemines, and St. Bernard and by the Louisiana Department of Energy and Natural Resources ("**LDNR**", with Parish plaintiffs collectively, the "**Louisiana Plaintiffs**"), along with other parishes in Louisiana, and seek to hold Reorganized Texaco liable under Louisiana's State and Local Coastal Resources Management Act of 1978 ("**SLCRMA**"). The cases have been pending since 2013, and Reorganized Texaco reports that the stakes are enormous, with potential liability in excess of

$100 billion, which is approximately half of Reorganized Texaco's parent company's (Chevron Corporation's) entire market capitalization. ECF No. 4009 ¶ 5 (defined below).

Reorganized Texaco depicts this as a straightforward matter. The Louisiana Plaintiffs never filed proofs of claim during the Debtor's bankruptcy, a Court-approved claims bar date passed, and confirmation of the plan discharged and enjoined claims against the estate, whether a proof of claim was or was not filed, other than as provided in the plan. As will be seen, the key merits question is that the plan excepted from discharge many or all governmental environmental claims, as defined and described further below. Reorganized Texaco argues that the Louisiana cases they now face do not fit within the plan's definition of preserved environmental claims, and that, as a result, this Court should reopen the long-closed case to enforce the plan's discharge and injunction provisions and bar the Louisiana Lawsuits.

The Louisiana Plaintiffs oppose reopening on various grounds. First, as a procedural matter that the Court finds sympathetic but unpersuasive, the Louisiana Plaintiffs argue that Texaco waited too long such that the laches doctrine or other timeliness requirements counsel against reopening the bankruptcy case. The Louisiana Plaintiffs observe that the cases pending in Louisiana were far advanced and over a decade old before the Debtor sought relief from this Court. Texaco disputes that it waited unreasonably long and argues that the passage of time is not dispositive because the Debtor faces an avalanche of litigation in multiple courts, all of which would need to grapple with a question that this Court is best positioned to answer. The Court concludes that Texaco did unreasonably delay in bringing its motions by waiting until the Louisiana Plaintiffs and the presiding courts had expended more than ten years in resource-intensive litigation during which Texaco erected numerous procedural roadblocks, with Texaco now attempting to derail the litigation during the bellwether case's final run-up to trial.

Nevertheless, the Court concludes, as it has before, that there is a paramount bankruptcy-court and systemic interest in having bankruptcy courts determine the meaning and impact of this Court's own prior orders. A decision by this Court would avoid repeated and possibly inconsistent adjudication by multiple courts as to the meaning of an order entered long ago by this Court, while also avoiding a risk of further, possibly wasteful litigation efforts in Louisiana. Thus, interests of judicial efficiency and providing certainty to the parties convince the Court that reopening the case is appropriate here. The Court therefore grants the Debtor's motion to reopen the bankruptcy case.

The merits of the Discharge Motion (defined below) boil down to whether the Louisiana Plaintiffs' claims fall within the confirmed plan's provision that carves out governmental environmental claims from the reach of the plan's discharge and injunction provisions. The plan excluded from discharge claims of governmental units arising under a long list of federal environmental statutes, and under "other" environmental laws of the various states. Reorganized Texaco insists that the governing Louisiana statute concerns permitting and land use and is not the type of environmental statute that the plan contemplated be excluded; Debtor places great weight on its contention that SLCRMA is not an "analog" to any federal statute that is listed as falling within the scope of the plan's exclusion of environmental claims.

The Court disagrees because the Louisiana statute at issue, although broad, incudes substantial regulatory requirements and enforcement mechanisms that fall within the general meaning of "environmental," and the confirmed plan's drafting as to state-law environmental claims is elastic, and not limited to the analogs of the plan's specifically listed federal statutes. This conclusion is reinforced by the realities of the Debtor's bankruptcy case, which was rooted in the Debtor's desperate need to resolve the status of a multi-billion-dollar judgment against it

held by Pennzoil, such that the Debtor made the reasonable decision to avoid expending the enormous time and effort that would have been required to identify and resolve all of the company's environmental claims and obligations through the bankruptcy process. In seeking confirmation, Texaco explained that it was achieving enterprise-critical objectives through its bankruptcy, while leaving unaffected whatever governmental environmental liabilities it might face as a result of its long history as an energy business. The Louisiana Lawsuits are one aspect of the reckoning over those legacy liabilities that the debtor consciously chose to have pass through the bankruptcy unaffected. For these reasons and as explained further below, the Court denies the Discharge Motion.

## I.   BACKGROUND[1]

### A.  Texaco's Chapter 11 Case and Subsequent Instances of Reopening the Case

#### 1.  Texaco's Chapter 11 Case

##### a.  Background of the Chapter 11 Case

On April 12, 1987, Texaco, Texaco Capital Inc., and Texaco Capital NV (collectively, "**Pre-Plan Texaco**") filed for relief under Chapter 11 of the Bankruptcy Code. Reopen Motion ¶ 5. The purpose of this filing was to compromise a judgment of $10.5 billion in favor of Pennzoil rendered by a jury in 1985. *See In re Texaco Inc.*, 254 B.R. 536, 541–42 (Bankr. S.D.N.Y. 2000) ("Texaco filed under Chapter 11 for the sole purpose of compromising a $10.5 billion judgment."). Although Pre-Plan Texaco was a major, profitable international oil company with a

---

[1] The parties submitted moving papers (by Reorganized Texaco), oppositions (by the Louisiana Plaintiffs), and replies (by Reorganized Texaco). This Decision refers to the parties' submissions on the two motions now before the Court as follows: ECF No. 4008 ("**Reopen Motion**"); ECF No. 4022 ("**Reopen Opp.**); ECF No. 4063 ("**Reopen Reply**"); ECF No. 4009 ("**Discharge Motion**"); ECF No. 4041 ("**Discharge Opp.**"); and ECF No. 4064 ("**Discharge Reply**").

$2 billion book value net worth, the "sole" reason for the filing was to prevent the Pennzoil

verdict from "crippling" the company. *Id.*; *see also In re Texaco Inc.*, 182 B.R. 937, 941 (Bankr.

S.D.N.Y. 1995) ("As appears from the disclosure statement, Texaco's filing resulted from the

highly publicized $10.5 billion verdict in favor of Pennzoil…").

In particular, Pre-Plan Texaco was concerned that Pennzoil would obtain judgment liens

against its assets, causing Pre-Plan Texaco to eventually become dismembered. *See In re Texaco

Inc.*, 182 B.R. at 941. Pre-Plan Texaco repeatedly tried but failed to upset or appeal the

judgment, and ultimately filed a Chapter 11 bankruptcy petition with the goal of negotiating the

Pennzoil judgment and, in every other respect, continuing its profitable global operations in the

ordinary course of business post-petition and post-confirmation. *See In re Texaco Inc.*, 182 B.R.

at 941; *In re Texaco Inc.*, 254 B.R. at 542; *see also Second Amended Disclosure Statement

Pursuant to Section 1125 of the Bankruptcy Code* ("**Disclosure Statement**"), TA at 141–45[2] ("In

order to protect the value of Texaco," the Texaco board approved the bankruptcy filing. "In

Texaco's opinion, this was the only viable means by which Texaco could pursue its appeal of the

Pennzoil judgment" and prevent Pennzoil from "seiz[ing] and sell[ing] Texaco's assets" pending

appeal.); *Memorandum of Law in Support of Confirmation of the Second Amended Joint Plan of

Reorganization Proposed by Texaco Inc., Texaco Capital Inc., Texaco Capital N.V. and Pennzoil

Company Pursuant to Section 1129 of the Bankruptcy Code* ("**Texaco Memorandum in

Support of Confirmation**"), at 14 ("[The Plan] provides the means through which Texaco can

---

[2] Given the antiquity of Reorganized Texaco's bankruptcy case and the difficulty of accessing the original pleadings, for convenience and ease of access, this Decision cites to Reorganized Texaco's appendix to the *Motion for Entry of an Order Enforcing the Discharge and Injunction in the Confirmation Order and Plan and the Bar Date Order* (the "Texaco Appendix" or "TA") located at ECF Nos. 4010-4020, which contains relevant pleadings from the original bankruptcy case. During its consideration of the Reopen and Discharge Motions, the Court asked Reorganized Texaco to locate and provide additional materials including the briefs that Pre-Plan Texaco submitted to seek approval of its Disclosure Statement and Plan (defined below). As of this writing, both Pre-Plan Texaco's and Pennzoil's memoranda of law in support of confirmation have been found, but no other documents were obtained.

resolve expeditiously the only issue which caused the commencement of its chapter 11 case, the disputed Pennzoil Judgment, and further allows Texaco to continue to operate as a viable entity."). In essence, this filing "provided Texaco with additional time to seek a reasonable settlement of the [Pennzoil] controversy." Disclosure Statement, TA at 145.

> b. *Chapter 11 Bar Date Order and Notice, Disclosure Statement, and Plan*

During the Chapter 11 case, Pre-Plan Texaco and Pennzoil settled their dispute for $3 billion payable in cash, and this Court approved the settlement in December 1987. *In re Texaco Inc.*, 182 B.R. at 941. Having reached this agreement, Pre-Plan Texaco turned its focus to emerging from bankruptcy with a plan of reorganization. *Id.* Needing a quick turnaround, on December 31, 1987, Pre-Plan Texaco filed a proposed "First Amended Joint Plan of Reorganization" and a disclosure statement. Discharge Opp., at 11.

On January 26, 1988, this Court entered an order ("**Bar Date Order**") that set March 15, 1988 ("**Bar Date**"), as the deadline to file proofs of claim against Pre-Plan Texaco. Discharge Motion ¶ 17; Discharge Opp., at 11. Specifically, the Bar Date Order stated that "[a]ll proofs of claim of creditors against the Debtors, except for creditors whose claims are described in paragraph 3 below, shall be filed with the Court on or before March 15, 1988 . . . ." Bar Date Order, TA at 1. One such group of exempted parties was described in subparagraph (g) as "[a]ny governmental unit, including, without limitation, any federal, state or local agency, with respect to a claim relating to the enforcement of environmental protection laws and regulations in accordance with the following or similar statutes," after which the Bar Date Order contained a list of thirteen federal laws:

1. Clean Air Act, 42 U.S.C. §§ 7401 *et seq.*
2. Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.*
3. Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901 *et seq.*

4. Toxic Substances Control Act, 15 U.S.C. §§ 2601 *et seq.*
5. Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601 *et seq.*
6. Safe Drinking Water Act, 42 U.S.C. §§ 300F, *et seq.*
7. Surface Mining Control and Reclamation Act, 30 U.S.C. §§ 1201 *et seq.*
8. Marine Protection Research and Sanctuaries Act, 33 U.S.C. §§ 1401 *et seq.*
9. River and Harbor Act, 33 U.S.C., 33 U.S.C. §§ 401 *et seq.*
10. Deepwater Port Act, 33 U.S.C. §§ 1501 *et seq.*
11. Uranium Mill Tailings Radiation Control Act, 42 U.S.C. §§ 7901 *et seq.*
12. Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C. §§ 136 *et seq.*
13. Mineral Leasing Act, 30 U.S.C. §§ 181 *et seq.*

(collectively, the "**13 Federal Environmental Statutes**"). Bar Date Order, TA at 4–5. The Bar

Date Order further stated that "[t]his order shall not apply to" governmental environmental

claims, among others, and that these government environmental creditors "are not required to"

file proofs of claim against Pre-Plan Texaco in order to participate in any distribution. Bar Date

Order, TA at 2.

To provide notice to all parties with potential claims about the requirements for filing

proofs of claim on or before the Bar Date, Pre-Plan Texaco sent and published a notice ("**Bar**

**Date Notice**") that informed creditors that claims against the Debtor must be filed before the Bar

Date or be forever barred and discharged. Discharge Motion ¶ 18; *see* Bar Date Notice, TA at 7.

Like the Bar Date Order, the Bar Date Notice provided a list of creditors that "need not file

proofs of claim at this time," which contained the same language quoted above from the Bar

Date Order describing subparagraph (g). Bar Date Notice, TA at 7–10. More than sixty thousand

copies of the Bar Date Notice were sent to parties-in-interest in Pre-Plan Texaco's Chapter 11

case, including many of the Louisiana Plaintiffs and related entities.[3] The Bar Date Notice was

---

[3] The mailing matrix, TA at 376, included the following entries: "Louisiana Dept of Env | Quality | Office of Water Resources," *id.* at 382; "Louisiana Dept Of Natural | Resources | Accounting Section," *id.*; "Louisiana Natural | Resources Dept | Coastal Management Div," *id.*; "State Of La | Dept Of Natural Resources | Office Of Conservation," *id.* at 385; "State Of Louisiana | Dept Of Conservation," *id.*; "Cameron Parish | Sheriff & Ex-Officio

not sent to the District Attorneys in the various parishes comprising the Louisiana Plaintiffs or to the "Police Juries, Parish Presidents, or Parish Councils." Discharge Opp., at 12, n. 29. None of the Louisiana Plaintiffs filed proofs of claim. Discharge Motion ¶ 2.

Prior to the confirmation hearing, Pre-Plan Texaco made modifications to the originally filed disclosure statement and plan. *See Order (A) Approving Disclosure Statement, (B) Fixing Time Within Which Equity Security Holders May Vote to Accept or Reject Plan of Reorganization, (C) Fixing Date, Time and Place for Hearing on Confirmation of Plan of Reorganization, (D) Approving Form of Ballot and (E) Approving Form of Notice for Publication* ("**Disclosure Statement Order**"), TA at 129. On January 27, 1988, Pre-Plan Texaco filed its *Second Amended Joint Plan of Reorganization Proposed by Texaco Inc., Texaco Capital Inc., Texaco Capital N.V. and Pennzoil Company* ("**Plan**"). *See* Plan, TA at 12. To consider approval of the updated plan and disclosure statement, this Court held hearings on January 27 and 29, 1988. *See* Disclosure Statement Order, TA at 129. On January 29, 1988, this Court approved Pre-Plan Texaco's Disclosure Statement. *See id.*

### c. Environmental Class: Plan Classification and Disclosure Statement

The Plan filed by Pre-Plan Texaco defined several classes of claims, and placed most unsecured claims in Classes 6-A, 6-B and 6-C. Discharge Motion ¶ 24 (citing Plan, TA at 36–37). All allowed claims in these classes were to be paid in full, but to be allowed any claim had to have been timely filed. *Id.* ¶ 28.

The Plan also provided for Class 3-B, which was defined as:

---

Tax Coll.," *id.* at 379; "Cameron Parish Clerk | Of Court," *id.*; "Jefferson Parish | Dept. Of Public Utilities," *id.* at 380; "Jefferson Parish | Sheriff's Office," *id.*; "Jefferson Parish | Tax Collector," *id.* at 381; "Jefferson Parish Clerk Of | Court & Ex-Officio | Recorder," *id.*; "Jefferson Parish Sales Tax," *id.*; "Jefferson Parish Sherrifs Offi[ce]," *id.*; "Plaquemines Parish | Clerk Of Court & Ex Officio Recorder," *id.* at 383; "Plaquemines Parish | Tax Collector," *id.*; "St Bernard Parish Water | & Sewage," *id.* at 378; and "St. Bernard Parish | Sheriff's Dept.," *id.* at 384.

> Unsecured Claims of the United States of America and other state and local
> governmental units arising under the statutes set forth on Exhibit "6" attached
> hereto and incorporated herein by reference and under other environmental
> protection legislation, rules or regulations enacted, adopted or promulgated by
> states or subdivisions thereof.

Plan, TA at 35–36. The referenced "Exhibit '6'" lists the 13 Federal Environmental Statutes. *Id.*,

TA at 128. In section IV.C of the Plan entitled "Unimpaired Class of Unsecured Claims Held by

the United States, Department of Energy and Claims Arising Under Environmental Laws," the

Plan stated the following regarding Class 3-B claims:

> Classes 3-A and 3-B **are not impaired** under the Plan. . . .The amount of any
> Class 3-A or Class 3-B Claim that is not an Allowed Claim, and the holder's
> rights, if any, to payment in respect thereof, shall (a) be determined in the manner
> and by the administrative or judicial tribunals in which the amount of such Claim
> and the holder's rights would have been resolved or adjudicated if the
> Reorganization Cases had not been commenced, (b) **survive the Confirmation
> and consummation of the Plan as if the Reorganization Cases had not been
> commenced**, and (c) **not be discharged pursuant to the Bankruptcy Code §
> 1141.** The Plan shall **leave unaltered the legal, equitable and contractual
> rights** to which each Class 3-A or Class 3-B Claim entitles its holder in
> accordance with Bankruptcy Code § 1124.

*Id.*, TA at 42–43 (emphasis added).

The Court-approved Disclosure Statement also discusses Class 3-B. In a letter to its

creditors encouraging them to vote for the Plan, Pre-Plan Texaco explained that the Disclosure

Statement "includes and describes" the Plan and urged creditors to read it "with care."

Disclosure Statement Order, TA at 132. The Disclosure Statement proceeds to explain that it

contained "information of a kind and in sufficient detail, adequate to enable a hypothetical,

reasonable investor typical of the class of Texaco Stockholders to make an informed judgment

whether to accept or reject the Plan." Disclosure Statement, TA at 136. The Disclosure Statement

also provided a "Summary of Classification and Treatment of Claims and Interests Under the

Plan," which identified "Claims of the Department of Energy and Environmental Claims" as being "Unimpaired; Allowed Claims paid in full, in cash, on the Effective Date; Claims which are not Allowed Claims will not be discharged and will survive the Reorganization Cases and be determined and paid as if the Reorganization Cases had not been commenced." *Id.*, TA at 138.

In defining "Environmental Claims," the Disclosure Statement stated the following:

> **The Plan does not impair** the Claims of the United States Department of Energy (the "DOE") **and the claims of any governmental unit arising under any environmental legislation (the "Environmental Claims")**. All Claims of the DOE and Environmental Claims not paid as hereinafter described will not be discharged and will survive the Reorganization Cases as if they had not been commenced. . . . Any Claims of the DOE and any Environmental Claims that are not Allowed Claims will be resolved by the administrative and/or judicial tribunals in which they would have been resolved had the Reorganization Cases not been commenced.

*Id.*, TA at 140 (emphasis added). The Disclosure Statement further stated, "[t]he Environmental Claims relate to any Claims which have been or may be asserted by any governmental unit arising under various federal or similar statutes regarding environmental protection and related legislation, rules and regulations." *Id.*, TA at 160. As stated above, the Bar Date Order and Bar Date Notice also contained similar language defining Class 3-B as including the claims of "any governmental unit, including, without limitation, any federal, state, or local agency, with respect to a claim relating to the enforcement of environmental protection laws and regulations in accordance with the following or similar statutes." Bar Date Order, TA at 4–5; Bar Date Notice, TA at 9–10.

The Disclosure Statement stated that the exclusion of the Environmental Protection Agency's ("**EPA**") and other agencies' claims was in line with Pre-Plan Texaco's goal of expeditiously exiting bankruptcy and to "avoid delaying these [bankruptcy cases] to resolve any potential dispute over [these] issues." Disclosure Statement, TA at 160. In fact, the Disclosure

Statement explicitly stated that Pre-Plan Texaco was "unable to estimate with any degree of certainty the amount of liability, if any, in respect of 'Environmental Claims.'" *Id.* The Disclosure Statement also noted that "following confirmation of the Plan, other environmental actions or proceedings arguably arising from Texaco's pre-petition acts may be asserted against Texaco." *Id.*

### d. Confirmation Order and Discharge

As stated above, the Plan discharged a wide array of pre-confirmation claims: "[e]xcept as otherwise provided in the Plan or in the Confirmation Order, Confirmation shall operate as a discharge, pursuant to Bankruptcy Code § 1141(d)(1), effective as of the Effective Date, of any and all debts of and Claims against one or more of the Debtors that arose at any time before Confirmation. . ." Plan, TA at 53. Thus, the Plan's discharge provisions precluded future assertions of pre-petition claims, except those expressly exempted from discharge such as claims classified in Class 3-B. *See* Discharge Motion ¶ 28.

To consider whether to approve the proposed Plan, this Court held a confirmation hearing on March 22, 1988. *See* Discharge Motion ¶ 29. The day after the hearing, this Court entered the confirmation order ("**Confirmation Order**") approving the Plan. *See* Confirmation Order, TA at 342. The order's language describing the discharge matched the Plan:

> Except as otherwise provided herein and in the Plan, and effective as of the Effective Date of the Plan, in accordance with section 1141(d) of the Bankruptcy Code, each of the Debtors be, and it hereby is, discharged of and from any and all debts and Claims that arose against it before the date of entry of this order . . . whether or not (i) a proof of claim based on such a debt is filed or deemed filed under section 501 of the Bankruptcy Code, (ii) such Claim is allowed under section 502 of the Bankruptcy Code, or (iii) the holder of such Claim has accepted the Plan.

11

*Id.*, TA at 348–49. The Confirmation Order also enjoined anyone from pursuing discharged

claims: "[t]he commencement or continuation of any action, the employment of process, or any

act to collect, recover or offset any debt discharged hereunder as a personal liability of any of the

Debtors, or from property of any of the Debtors, be, and it hereby is, permanently enjoined,

stayed and restrained." *Id.*, TA at 349–50.

The effective date of the Plan was at least fifteen days after the date of the Confirmation

Order, with an additional requirement that there were no stays of the Confirmation Order and

that all conditions in the Plan's Article VIII were met or waived. Plan, TA at 17. On April 7,

1988, the Court issued a "Notice of (i) Confirmation of Plan of Reorganization and (ii) Discharge

of Debts" ("**Notice of Confirmation**"), which confirmed that Pre-Plan Texaco was "discharged

from any and all debts . . . that arose . . . before the date of entry of the Confirmation Order, . . .

other than . . . [c]ertain unsecured debts *arising under environmental laws* which are not Allowed

Claims, as defined in and more fully described in the Plan: whether or not (i) a proof of claim

based on such debt was filed or deemed filed . . . ." TA at 357–58 (emphasis added).

### 2.    Subsequent Decisions Reopening the Bankruptcy Case

At several times since the Texaco case was deemed fully administered and was closed,

Reorganized Texaco's bankruptcy case was reopened to address a number of issues that

implicated the confirmed Plan. *See In re Texaco Inc.*, 182 B.R. 937 (Bankr. S.D.N.Y. 1995); *In

re Texaco, Inc.*, No. 05 CIV. 7533 (CLB), 2006 WL 8462735 (S.D.N.Y. June 20, 2006); *Texaco

Inc. v. Kling Realty Co. (In re Texaco Inc.)*, No. 87 B 20142 (RDD) (Bankr. S.D.N.Y. Aug. 3,

2010), *aff'd*, No. 10-CV-8151, 2011 WL 4526538 (S.D.N.Y. Sept. 28, 2011), *aff'd. In re Texaco,

Inc.*, 505 F. App'x 77) (2d Cir. 2012); *Order Granting Motion of Texaco Inc. for Order

Reopening Texaco's Chapter 11 Case*, Feb. 12, 2017, ECF No. 3923. In each of these instances,

12

this Court granted Reorganized Texaco's motion to reopen the bankruptcy case and entered an

order enforcing the discharge against the various litigants who contended that their claims were

not discharged. None of the prior reopening decisions turned on whether an involved litigant

held an environmental claim that should be categorized as a Class 3-B claim and therefore

survive unaffected by Reorganized Texaco's bankruptcy. Consequently, an in-depth discussion

of the specific facts of these prior decisions is not necessary or instructive for the purposes of this

Decision.

## B.  Legal Basis for Louisiana Plaintiffs' Claims

The federal Coastal Zone Management Act, 16 U.S.C. §§ 1451 *et seq.* ("**CZMA**"), was

enacted in 1972 and authorizes states to develop coastal management programs. Considering the

"increasing and competing demands . . . occasioned by population growth and economic

development" and "the urgent need to protect and to give high priority to natural systems in the

coastal zone," Congress passed the CZMA to expand the ability of state coastal zone

management programs to address coastal environmental problems. 16 U.S.C. §§ 1451, 1452. The

CZMA authorizes states to develop and subsequently submit coastal management programs for

approval by the National Oceanic and Atmospheric Administration ("**NOAA**"), a federal agency

within the Department of Commerce. *Id.* §§ 1454, 1455, 1511.

In 1980, the NOAA approved SLCRMA, again Louisiana's State and Local Coastal

Resources Management Act of 1978, La. Rev. Stat. § 49:214.21 *et seq.* (1978), which established

a comprehensive regulatory regime that regulates the various "uses" of the Louisiana coastline

and requires "coastal use permits" for any non-exempt uses thereof. *See* La. Rev. Stat. §

49:214.30. A use is defined as "any use or activity within the [Louisiana] coastal zone which has

a direct and significant impact on [its] coastal waters." *Id.* § 49:214.23(13). Uses subject to the

costal use permitting program include "mineral activities, including exploration for, and

production of, oil, gas, and other minerals, all dredge and fill uses associated therewith, and all other associated uses," with the caveat that presently-existing permits issued pursuant to statutory authority of the Louisiana Office of Conservation within the LDNR shall be issued in lieu of "coastal use permits" provided that these permits comply with the applicable state and federal guidelines. *Id.* §§ 49:214.25(A)(1)(f), 49:214.31(B). SLCRMA became effective in September 1980, and the statute contains a "grandfather clause" that exempts activities that were "lawfully commenced and established" prior to 1980 from requiring a permit. *Id.* § 49:214.34. The program is administered by the LDNR through the Office of Coastal Management, whose primary function is to issue permits with the purpose of balancing uses and economic development with the need to protect and restore the coastal region of the state. *See id.* §§ 49:214.26, 49:214.22.

The SLCRMA declares that it is the public policy of the State of Louisiana "[t]o develop and implement a coastal resources management program which is based on consideration of [the state's] resources, the environment, the needs of the people of the state, the nation, and of state and local government." *Id.* § 49:214.22(5). This declaration continues, "it is the public policy of the state . . . [t]o support and encourage multiple use of coastal resources consistent with the maintenance and enhancement of renewable resource management and productivity, the need to provide for adequate economic growth and development and the minimization of adverse effects of one resource use upon another, and without imposing any undue restriction on any user." *Id.*

The Coastal Use Guidelines issued under SLCRMA include specific guidelines for oil, gas, and other mineral activities. *See* La. Admin. Code tit. 43, pt. I, § 719 (1980). For example, the Coastal Use Guidelines provide that exploration and production facilities shall be designed, constructed, and sustained "to maintain natural water flow regimes, avoid blocking surface

drainage, and avoid erosion," and that "[d]rilling and production sites shall be prepared, constructed, and operated using the best practical techniques to prevent the release of pollutants or toxic substances into the environment." *Id.* § 719(D), (F). Further, the guidelines state that "[m]ineral exploration, production, and refining facilities shall be designed and constructed using best practical techniques to minimize adverse environmental impacts." *Id.* § 719(J). Finally, subsection (M) specifically provides that "[m]ineral exploration and production sites shall be cleared, revegetated, detoxified, and otherwise restored as near as practicable to their original condition upon termination of operations to the maximum extent practicable." *Id.* § 719(M).

Subsection (36) of SLCRMA provides for enforcement of the statute. *See* La. Rev. Stat. § 49:214.36. The statute stipulates that the secretary of the LDNR and each local government with an approved program has the power to initiate a "field surveillance program" to ensure proper enforcement of the program, to issue cease and desist orders, to suspend, revoke, or modify coastal use permits, and to bring injunctive, declaratory, or other actions as necessary, among other listed powers. *See id.* Additionally, if a party is found to violate SLCRMA, a court may "impose civil liability and assess damages," "order . . . the payment of restoration costs," and/or "require . . . actual restoration of areas disturbed," among other relief. *Id.* § 49:214.36(E).

### C.  State Litigation History

Starting in 2013, the Louisiana Plaintiffs, along with a few other parishes in Louisiana, filed forty-two state-court lawsuits against various oil and gas companies for violations of SLCRMA. *See* Discharge Motion ¶¶ 40–41; Reopen Opp., at 1. Twenty-two[4] of these lawsuits seek to hold Reorganized Texaco and/or its affiliates liable for violations of SLCRMA from oil and gas activities conducted in the Louisiana coastline region, which allegedly caused damage in

---

[4] At times, the parties say twenty-three lawsuits involve Reorganized Texaco. The exact number is immaterial to this Decision.

the form of land loss and contamination. *See* Discharge Motion ¶ 41–43; Reopen Opp., at 1. The

Louisiana Plaintiffs assert no claims under any other state law. Discharge Motion ¶ 41.

Specifically, the petitions (the term for complaints in Louisiana state court) seek damages

and other relief based on alleged violations of coastal use permits issued under SLCRMA and

based on alleged violations of SLCRMA resulting from Texaco's failure to obtain permits for

non-exempt uses of the coastal zone after SLCRMA became effective. *See* Discharge Opp., at

26, 28. For example, in *The Parish of Plaquemines v. Rozel Operating Company*, et al., No. 60-

966 (La. 25th Judicial Dist.), the Louisiana Plaintiffs' prayer for relief requests the following: (1)

"[a]warding damages and other appropriate relief specifically provided in [SLCRMA]"; (2)

"[o]rdering the payment of costs necessary to clear, revegetate, detoxify and otherwise restore

the Plaquemines Parish Coastal Zone as near as practicable to its original condition pursuant to

[La. Admin. Code tit. 43, pt. I, §§ 705(N), 711(F), and 719(M)]"; and (3) "[r]equiring actual

restoration of the Plaquemines Parish Coastal Zone to its original condition," among others.

Petition for Damages to the Plaquemines Par. Coastal Zone, *Par. of Plaquemines v. Rozel

Operating Co., et al.*, No. 60-996, (La. 25th Judicial Dist.) ("**Rozel Petition for Damages**"), TA

at 414–15. In the preceding paragraph in the *Rozel* Petition for Damages, Louisiana Plaintiffs

also seek declaratory relief in addition to money damages to "accomplish the purposes of [La.

Rev. Stat.] § 49:214.36 *et seq*." *Id.*, TA at 414.

All forty-two of these suits were removed to the United States District Courts for the

Eastern and Western Districts of Louisiana on various grounds, but were, eventually, remanded.

Discharge Opp., at 1. After remand, the state district judge in the Plaquemines Parish "cleared

most of his calendar for a year" and scheduled five of the Plaquemines Parish cases for trial. *Id.*

The first of these twenty-two cases to be set for trial was *Par. of Plaquemines v. Rozel Operating*

*Co., et al.*, No. 60-996 (La. 25th Judicial Dist.) ("**Rozel**"), which was scheduled for trial nearly

six years ago, in March 2019. *Id.* In preparation for the *Rozel* trial, "the parties conducted

extensive discovery, which included numerous written interrogatories, requests for production

and requests for admission, the exchange of thousands of pages of documents and corporate

records custodian depositions." Reopen Opp., at 10.

As required by a case management order that was entered in the state district court,

Plaquemines Parish filed its preliminary expert report (the "**2018 Rozel Report**") on April 30,

2018. *Id.*, at 11–12. Before any case could be tried, however, all forty-two cases were removed

by defendants and Reorganized Texaco moved for MDL treatment of all the cases. Discharge

Opp., at 2. As quoted by the Fifth Circuit in *Plaquemines Par. v. Chevron USA, Inc.*, Judge

Feldman of the United States District Court of the Eastern District of Louisiana characterized

Reorganized Texaco's alleged attempt to delay this case as "shameful." Discharge Opp., at 2

(citing 84 F.4th 362, 368 (5th Cir. 2023) ("On remand, Judge Feldman agreed with Plaquemines

Parish at oral argument that it was 'bordering on absurd' that jurisdictional litigation had delayed

these cases for so long. He then added, 'Frankly, I think it's kind of shameful.' That very same

day, he reaffirmed his previous remand order, finding '[f]or a third time,' that 'these cases' do

not 'belong in federal court.'")).

After remand was granted in *Par. of Cameron v. Auster Oil & Gas, Inc.*, No. 10-19582

(La. 25th Judicial Dist.) ("**Auster**"), the Cameron Parish district judge set a jury trial to begin

November 27, 2023. Reopen Opp., at 13. In that case, the parties exchanged extensive discovery,

including depositions, documents, and expert reports. *See id.*, at 13–14. After the state district

court ruled on several summary judgment motions and motions challenging the expert reports,

the *Auster* case settled shortly before the trial was set to begin. *See id.*, at 14. Shortly thereafter,

17

the *Rozel* case was set for trial on March 10, 2025. *Id.*; Discharge Motion ¶ 42. In June and July

of 2024, the Plaquemines Parish served further expert reports setting forth details of the theories

of liability that it intended to pursue in *Rozel*. Discharge Motion ¶¶ 42, 44–45. These expert

reports are the bases on which Reorganized Texaco asserts that it first learned that the Louisiana

Plaintiffs were seeking relief for pre-confirmation conduct, thus, according to Reorganized

Texaco, leading to the current motions to reopen the bankruptcy case and enforce the discharge.

*See* Reopen Motion ¶¶ 1–2, 4.

In *Rozel*, the Louisiana Plaintiffs are seeking to recover $3.4 billion for implementing a

restoration plan that would "bring the Gentilly case area back to a wetland area similar to historic

conditions (1940 land area)," restore soil and sediment, and remove wastewater from the area.

Discharge Motion ¶¶ 44, 5 (citing Jenneke M. Visser, Expert Rep. on Restoration (July 26,

2024) filed in *Par. of Plaquemines v. Rozel Operating Co.*, No. 60-966 (La. 25th Judicial Dist.),

TA at 869; Gregory W. Miller & Jason Sills, Expert Rep. (July 29, 2024) filed in *Par. of

Plaquemines v. Rozel Operating Co.*, No. 60-966 (La. 25th Judicial Dist.), TA at 643). *Rozel* is

just one of twenty-two cases filed against Reorganized Texaco and involves only 2.7% of the

pre-confirmation Texaco wells at issue in these suits. *Id.* ¶ 5. Consequently, Reorganized Texaco

contends that "[i]f the Louisiana Plaintiffs seek a comparable recovery on a per-well basis in the

other cases, their claimed damages would presumably exceed $100 billion, which is

approximately half of Reorganized Texaco's parent's (Chevron Corporation's) entire market

capitalization." *Id*.

### D. Parties' Arguments

As stated in the introduction above, the parties have filed various motions, oppositions,

and replies. This Court first broadly summarizes each in turn, with more detail provided in the

pertinent discussion section.

### 1. Reopen Motion and Discharge Motion

On November 15, 2024, Reorganized Texaco moved to reopen its bankruptcy case

pursuant to Sections 105(a) and 350(b) the Bankruptcy Code, Rule 5010 of the Bankruptcy

Rules, and Rule 5010-1 of the Local Bankruptcy Rules for the Southern District of New York.

*See* Reopen Motion. In its motion, Reorganized Texaco contends that although the Louisiana

Plaintiffs have long disavowed that they were pursuing claims that were discharged, the

"recently served" expert reports in *Rozel* demonstrate that Louisiana Plaintiffs seek to hold

Reorganized Texaco liable for pre-confirmation conduct. *Id.* ¶ 1. The Debtor argues that some or

all of these claims were discharged and enjoined as a result of the Confirmation Order, Plan, and

Bar Date Order. *Id.* ¶ 2. In the Reopen Motion, the Debtor seeks to reopen the bankruptcy case

for the limited purpose of determining whether any of the Louisiana Plaintiffs' claims were

indeed discharged and barred. *Id.* ¶ 4.

Also on November 15, 2024, Reorganized Texaco filed a motion seeking entry of an

order enforcing the discharge and injunction as provided in the Debtor's previous bankruptcy's

Confirmation Order, Plan, and Bar Date Order on the theory that the Louisiana Plaintiffs' claims

arose pre-petition and were discharged. *See* Discharge Motion ¶ 2.

### 2. Reopen Opp. and Discharge Opp.

On November 20, 2024, the Louisiana Plaintiffs filed an opposition to the Reopen

Motion. *See* Reopen Opp. In their opposition, they argue that Reorganized Texaco unduly

delayed seeking to reopen the bankruptcy cases, after the company already caused substantial

and unjustified delays with various removal attempts. *Id.*, at 2–4. The Louisiana Plaintiffs object

that reopening this case would severely prejudice them given that trial in *Rozel* is scheduled for

March 2025. *Id.*, at 2–3.

On December 5, 2024, the Louisiana Plaintiffs filed their opposition to the Discharge

Motion. *See* Discharge Opp. The Louisiana Plaintiffs maintain that their claims constitute Class

3-B claims and accordingly were unaffected by the Plan's discharge provisions. *See* Discharge

Opp., at 11–24. The Louisiana Plaintiffs also contend that this Court should refrain from

deciding the Discharge Motion based on doctrines including permissive abstention under 28

U.S.C. § 1334, *Burford* abstention, and laches. *See id.*, at 24–37.

### 3.  Reopen Reply and Discharge Reply

On December 9, 2024, Reorganized Texaco filed a reply in response to the Reopen Opp.

*See* Reopen Reply. Debtor's reply contends that discharge is not subject to equitable defenses

such that laches cannot bar its request for relief, that the supposed delay asserted by the

Louisiana Plaintiffs is both mischaracterized and irrelevant, and that abstention is inappropriate

in these circumstances, among other arguments. *Id.*

Also on December 9, 2024, Reorganized Texaco filed a reply in response to the

Discharge Opp., reiterating that the Louisiana Plaintiffs' claims should not be categorized in

Class 3-B, and that neither abstention nor laches should prevent the court from deciding the

motion. *See* Discharge Reply.

## II.    **JURISDICTION**

The Court has subject matter jurisdiction over the present motions under 28 U.S.C. §§

157(a)–(b) and 1334(b), and the reservation of jurisdiction in the Plan and Confirmation Order.

*See* Confirmation Order ¶ 29, TA at 352 ("The Court shall retain jurisdiction in accordance with

(and as limited by) Article IX of the Plan and section 1142 of the Bankruptcy Code."); Plan §§

IX.A.1, 2, & 7, TA at 63, 65. Venue is appropriate under 28 U.S.C. § 1409(a).

### III.    DISCUSSION

#### A.  Reopen Motion

##### 1.  Legal Standard

Pursuant to Bankruptcy Rule 5010, a bankruptcy case may be reopened "[o]n the debtor's or another party in interest's motion." Fed. R. Bankr. P. 5010. Under Section 350(b) of the Bankruptcy Code, "[a] case may be reopened in the court in which such case was closed to administer assets, to accord relief to the debtor, or for other cause." 11 U.S.C. § 350(b). The Bankruptcy Code does not specify what constitutes "cause" to reopen a closed case. *See In re Solutia, Inc.*, 653 B.R. 99, 113 (Bankr. S.D.N.Y. 2023). Rather, the determination of whether a case should be reopened for other cause "invoke[s] the bankruptcy court's equitable powers, which is dependent on the facts and circumstances of the case." *Id.* (citing *Katz v. I.A. All. Corp. (In re I. Appel Corp.)*, 104 Fed. App'x 199, 200 (2d Cir. 2004)). This decision is "committed to the 'broad discretion' of the bankruptcy court." *Id.* (citing *Batstone v. Emmerling (In re Emmerling)*, 223 B.R. 860, 864 (B.A.P. 2d Cir. 1997)). In exercising this broad discretion, a court "may consider numerous factors including equitable concerns, and ought to emphasize substance over technical considerations." *In re Atari, Inc.*, No. 13-10176 (JLG), 2016 WL 1618346, at *4 (Bankr. S.D.N.Y. Apr. 20, 2016) (quoting *In re Emmerling*, 223 B.R. at 864).

Bankruptcy courts in this district have considered the following six factors to be relevant to motions to reopen:

(1) the length of time that the case was closed;
(2) whether a nonbankruptcy forum has jurisdiction to determine the issue that is the basis for reopening the case;
(3) whether prior litigation in the bankruptcy court determined that another court would be the appropriate forum;
(4) whether any parties would suffer prejudice should the court grant or deny the motion to reopen;
(5) the extent of the benefit to any party by reopening; and

(6) whether it is clear at the outset that no relief would be forthcoming if the
motion to reopen is granted.

*In re Easley–Brooks*, 487 B.R. 400, 407 (Bankr. S.D.N.Y. 2013); *see Atari*, 2016 WL 1618346,

at *4–5 (applying the factors). The burden of demonstrating circumstances sufficient to justify

reopening the case is on the moving party. *Easley–Brooks*, 487 B.R. at 406. As this Court has

previously explained, "it is well settled that the 'bankruptcy court is undoubtedly the best

qualified to interpret and enforce its own orders including those providing for discharge and

injunction.'" *In re U.S.H. Corp. of New York*, 280 B.R. 330, 335 (Bankr. S.D.N.Y. 2002)

(quoting *In re Texaco, Inc.*, 182 B.R. 937, 947 (Bankr. S.D.N.Y. 1995)).

### 2.  Parties' Contentions

#### a.  *Reorganized Texaco's Motion to Reopen*

Reorganized Texaco contends that its Reopen Motion was triggered by the fact that

although the Louisiana Plaintiffs have long disavowed that they were pursuing claims that were

discharged, the "recently served" June and July 2024 expert reports in *Rozel* revealed that the

Louisiana Plaintiffs seek to hold Reorganized Texaco liable for pre-confirmation conduct that

Texaco contends was discharged and enjoined as a result of the Confirmation Order, Plan, and

Bar Date Order. Reopen Motion ¶¶ 1–23.

The Debtor first argues that reopening is appropriate under the 11 U.S.C. § 350(b) to

"accord relief to the debtor," which in this case, comes in the form of enforcing the injunction

provisions in the Confirmation Order, the Plan, and Bar Date Order. *Id.* ¶ 10.

The Debtor then contends that reopening this bankruptcy case is also appropriate for a

second reason set forth in 11 U.S.C. § 350(b)—"for other cause"—which Reorganized Texaco

argues affords the bankruptcy court "broad discretion." *Id.* ¶ 11. Applying the six-factor test

recited above, first, the Debtor maintains that this Court can best determine whether the

discharge in the Plan bars the Louisiana Lawsuits because this Court is best qualified to interpret

its own prior orders and because the Plan and Confirmation Order explicitly reserved this Court's

jurisdiction to decide such issues. *Id.* ¶ 12. Second, Reorganized Texaco argues that "no party

would be improperly prejudiced" by this Court reopening the case to decide these issues because,

notwithstanding that the Louisiana Lawsuits have been pending for "several years" (sic), the

petitions that they initially filed were allegedly "vague and general, and expressly disavowed

asserting discharged claims." *Id.* ¶ 13. The Debtor claims that it "[o]nly recently" realized that

the Louisiana Plaintiffs alleged (or sought recovery for) pre-confirmation conduct when the

expert reports connected to the *Rozel* suit were shared in June and July of 2024. *Id.* ¶ 13. Debtor

also argues that the large potential recovery further "evidences the necessity of redress in this

Court." *Id.* ¶ 13. Third, Reorganized Texaco emphasizes that this Court is uniquely qualified to

"interpret and enforce past orders" and that such a determination "would provide a significant

benefit to litigants as it could narrow or even eliminate many of the claims asserted in the

Louisiana Lawsuits," thereby allegedly "streamlining any remaining litigation in the Louisiana

courts." *Id.* ¶ 14. Lastly, the Debtor notes that this Court has reopened these Chapter 11 cases

multiple times in the past to enforce provisions in the Confirmation Order and Plan. *Id.* ¶ 15.

> b.  *Louisiana Plaintiffs' Opposition to the Motion to Reopen*

The Louisiana Plaintiffs argue that Reorganized Texaco's bankruptcy case should not be

reopened and that the Louisiana state court should decide issues related to discharge. *See*

*generally* Reopen Opp.

First, the Louisiana Plaintiffs argue that both timeliness factors identified in *In re Easley–*

*Brooks* weigh against reopening: (1) the bankruptcy proceeding was finalized over thirty years

ago, and (2) Reorganized Texaco was aware that the Louisiana Plaintiffs' complaint concerned

pre-confirmation operations from at least when it received the 2018 *Rozel* Report, yet

Reorganized Texaco nevertheless delayed filing its motion by six years, waiting until just a few

months before the lead case is scheduled for a lengthy trial in Louisiana state court. *See Id.*, at 3,

18. The Louisiana Plaintiffs further maintain that "if the timing of a motion is a 'stalling tactic'

to delay state-court litigation, then the court should not reopen the case." *Id.*, at 17 (citing

*Redmond v. Fifth Third Bank*, 624 F.3d 793, 799 (7th Cir. 2010); *Matter of Bianucci*, 4 F.3d 526,

527–29 (7th Cir. 1993)).

Second, the Louisiana Plaintiffs claim that they would be prejudiced by further delays in

the event that the Court reopens this case, as this would disrupt "trials currently scheduled in

multiple cases in 2025." *Id.*, at 3. They explain that the parties in the state suits have "conducted

substantial fact and expert discovery, expended considerable amounts on experts, and conducted

significant motion practice. . . ." *Id.* They claim that the Debtor has "engaged in a consistent

practice of delay, preventing the [Louisiana Plaintiffs] from obtaining substantive relief." *Id.*

And they claim that, if this Court grants Reorganized Texaco's motions, the scheduled March

2025 trial almost surely cannot go forward because the case has been prepared in reliance on

proof that heavily involves Texaco's pre-petition activities. *See id.*; *see also* Transcript of Dec.

12, 2024 Hearing at 114-115, *In re Texaco Inc.*, No. 87-20142 (2024).

Lastly, the Louisiana Plaintiffs argue that the Court should consider a number of

"substantive issues" in deciding the Reopen Motion, namely whether the Louisiana Lawsuits are

an exercise of police power, whether the court should abstain, whether the Louisiana Lawsuits

cover post-confirmation conduct and whether such conduct is dischargeable, whether the Debtor

provided actual or constructive notice of the Bar Date to the Louisiana Plaintiffs, whether the

Debtor waived its claim to rely on this Court's discharge order because of their failure to raise

this defense in state court, and whether laches applies. *Id.*, at 18–19. Finally, the Louisiana

Plaintiffs contend that abstention is appropriate in this case. *Id.*, at 9

### c.   Reorganized Texaco's Reply

Reorganized Texaco's reply re-asserts that discharge is not subject to equitable defenses,

especially laches, because a discharge voids any judgment obtained against the Debtor. *See*

Reopen Reply ¶¶ 3–4. Debtor emphasizes that this Court has so found in a prior decision

reopening the Texaco bankruptcy case. *Id.* ¶ 10 (citing Transcript of May 28, 2010 Telephone

Hearing at 11, *Kling Realty Co. v. Texaco, Inc. (In re Texaco, Inc.)*, No. 87-20142 (2010)

("neither waiver nor laches apply here given primarily the fact that under the bankruptcy code,

the discharge which in a Chapter 11 case benefits not only the debtor but the debtor's creditors

and in a solvent case the debtor's shareholders cannot be waived by conduct or even an

agreement without proper approval under Section 524 of the bankruptcy code")). As to

abstention, the Debtor argues that there is a presumption in favor of courts exercising their

jurisdiction and thus against abstention that the Louisiana Plaintiffs have not overcome; that the

Louisiana Plaintiffs premise their arguments incorrectly by treating the merits of the Louisiana

Lawsuits instead of the Discharge Motion as the proceeding in favor of which they would have

this Court abstain; and that even setting this issue aside, the factors courts apply to abstention

motions counsel against abstention. *See id.* ¶¶ 19–26. Specifically, Reorganized Texaco contends

that: (1) the bankruptcy question of plan interpretation predominates over, and the Court need

not even decide, the merits of the Louisiana Lawsuits themselves; (2) the two cases relied on by

the Louisiana Plaintiffs are inapposite and contrary to more relevant authority; (3) Debtor did not

concede that the Louisiana Lawsuits are an exercise of police power during their removal

attempts and the Discharge Motion is a core proceeding "arising in" Reorganized Texaco's

bankruptcy case; and (4) the factors considered in evaluating permissive abstention are focused

on "efficient bankruptcy administration" and that interest would be disserved by requiring the

state court to decide the case only for the Debtor to ask this Court to determine if the judgment is

void after the fact. *Id.* (internal citation omitted). On this final point, the Debtor reasons that this

Court is in the best position to interpret its own orders, and it will be far more efficient to have

this Court decide the discharge issue now rather than after some or all of the state court cases

conclude. *Id.* ¶ 6.

Reorganized Texaco also dismisses the Louisiana Plaintiffs' other arguments. *Id.* ¶¶ 16–

18, 28–34. First, the Debtor maintains that even though delay would not justify denying its

motion, Reorganized Texaco did not unreasonably delay because it was not apprised of the

significance of the *Rozel* case allegations of pre-confirmation conduct until the June and July

2024 expert reports, and, in the other twenty-one state-court cases, "discovery either has not

started or is in its infancy." *Id.* ¶ 5. Second, Reorganized Texaco argues whether the Louisiana

Lawsuits are an exercise of police power is irrelevant as the Bankruptcy Code does not protect

claims of government units from discharge. *Id.* ¶ 28. Lastly, Reorganized Texaco disputes the

plaintiffs' contention that the Louisiana Plaintiffs' SLCRMA claims are administrative claims.

*Id.* ¶ 31.

3.   Merits of the Reopen Motion

For reasons detailed below, the Court grants the motion to reopen the main bankruptcy

case notwithstanding the passage of many years since confirmation, and notwithstanding

Reorganized Texaco's troubling decision not to approach this Court until after more than a

decade of intensive litigation of the Louisiana Lawsuits, during which the parties and the

Louisiana courts (federal and state) invested enormous effort and expense. The essence of the

26

Court's conclusion is that reopening Reorganized Texaco's case is the best way—really the only feasible way—to achieve a prompt, actionable, and broadly applicable determination of the impact of Reorganized Texaco's discharge on the Louisiana Lawsuits. The unpalatable alternative if this Court refused to reopen the case would be to oblige the interpretation and application of this Court's order by multiple courts that did not issue the order or preside over the case, in the course of multiple, resource-intensive trials that also will address complex and important merits issues. The result would be to risk inconsistent outcomes interpreting this Court's discharge order while consigning litigants to potentially fruitless and burdensome trials and associated litigation.

This broad conclusion is reinforced by application of the *Easley–Brooks* factors that apply to motions to reopen closed bankruptcy cases. *See* 487 B.R. at 407. First, this Court's Confirmation Order explicitly retained jurisdiction to decide issues relating to this case. Confirmation Order ¶ 29, TA at 352 ("The Court shall retain jurisdiction in accordance with (and as limited by) Article IX of the Plan and section 1142 of the Bankruptcy Code."). Although the state and bankruptcy courts in this case have concurrent jurisdiction to decide whether the Louisiana Plaintiffs' claims in the state court actions have been discharged, this Court has a strong interest in construing the meaning of its own confirmation orders, which are central to the case and to the institutional role of this Court. *See In re Texaco, Inc.*, 182 B.R. 937, 947 (Bankr. S.D.N.Y. 1995) (finding that the "bankruptcy court is undoubtedly the best qualified to interpret and enforce its own orders including those providing for discharge and injunction"); *In re U.S.H. Corp. of New York*, 280 B.R. 330, 335 (Bankr. S.D.N.Y. 2002). Indeed, this Court has emphasized this consideration in repeatedly reopening the Texaco bankruptcy case to resolve earlier disputes about the meaning of the Confirmation Order and discharge. *See supra* at I. A. 2.

Second, the potential benefits of reopening this case include allowing this Court to
construe its own Confirmation Order and Plan and to decide whether and to what extent the
Louisiana Plaintiffs' claims are barred by the discharge. In essence, either this Court will
determine that these claims are what the Plan termed Class 3-B claims, and thus not blocked by
the discharge such that the Louisiana Lawsuits can continue as planned, or this Court will
determine that these claims are not excepted from the Plan's discharge, which would preclude
recoveries for any of the pre-petition conduct at issue in the state court cases. Either way, the
parties will benefit from the informed assessment and broadly applicable answer that this Court
is uniquely able to provide. Moreover, proceeding in this Court is consistent with the widespread
recognition that enforcement of bargained-for rights under a Plan justifies reopening a
bankruptcy case. *See Atari*, 2016 WL 1618346, at *11 ("Courts have held that the need to
enforce rights that were bargained for in a confirmed plan of reorganization constitutes a
sufficient benefit to justify reopening a bankruptcy case.") (internal quotation marks omitted).

Third, reopening the case will yield effective and beneficial relief by determining
whether the labor-intensive Louisiana Lawsuits are or are not precluded (in whole or in
substantial part) by the bankruptcy discharge.

Fourth, reopening this case will not prejudice either party. The Louisiana Plaintiffs
contend that they would be prejudiced by further delays which would disrupt "trials currently
scheduled in multiple cases in 2025," especially the first case set for trial in *Rozel* in March
2025. *See* Reopen Opp., at 3. They note that the parties in the state suits have "conducted
substantial fact and expert discovery, expended consideration amounts on experts, and conducted
significant motion practice." *Id.* Despite the legitimacy of these concerns, however, reopening
this case to decide the applicability of the discharge as set forth in this Court's Confirmation

Order will not cause prejudice. On the contrary, a decision regarding whether discharge is applicable to the multitude of cases would be decisive as to a specific issue applicable to the Louisiana Lawsuits before any trial is to occur. Such a decision would promote judicial efficiency as the state courts in the twenty-two lawsuits would not each need to engage in the exercise of interpreting this Court's prior order. Furthermore, as the Court promised the parties at the hearing on December 12, 2024, this Decision is being issued weeks before the *Rozel* trial date.

The *Easley–Brooks* factor related to timeliness does weigh in favor of the Louisiana Plaintiffs, that is, against reopening. With respect to timing, the inquiry focuses on two distinct and significant time frames: (1) the length of time between the estate's closing and the motion to reopen, and (2) the length of time a party waits before filing a motion to reopen. *See In re One2One Communs., LLC*, 627 B.R. 273, 284 (Bankr. D.N.J. 2021). First, Reorganized Texaco's bankruptcy case was finalized approximately 36 years ago—by any measure, long ago. Second, although Reorganized Texaco downplays the length of time it knew that the Louisiana Plaintiffs' allegations concerned pre-petition conduct, the petitions date back to 2013 and clearly implicate decades-long conduct by Pre-Plan Texaco. The Court credits the Louisiana Plaintiffs' contention that the Debtor knew or should have known the plaintiffs were pursuing remedies for pre-confirmation conduct since at least when the Debtor received the 2018 *Rozel* Report, and yet Debtor delayed filing the Reopen Motion for six years. The Debtor maintains that it only recently realized that the Louisiana Plaintiffs sought recovery for pre-confirmation conduct when the expert reports particularizing the theories of liability connected to the *Rozel* suit were disclosed in June and July of 2024. *See* Reopen Opp., at 18; *see also* Reopen Motion ¶ 13. But Debtor's professed surprise rings hollow given the case's age and the scope of activity that is clearly

implicated. Debtor has identified no disavowal of any intention of the Louisiana Plaintiffs to remediate alleged harms that they surely contend result from longstanding defendant activities.

Indeed, Louisiana Plaintiffs further maintain that if the timing of a motion indicates a "stalling tactic" to delay state-court litigation, then the courts should not reopen the case. Reopen Opp., at 17 (citing *Redmond v. Fifth Third Bank*, 624 F.3d 793, 799 (7th Cir. 2010)). They claim that the Debtor has "engaged in a consistent practice of delay, preventing the [Louisiana Plaintiffs] from obtaining substantive relief" with their various removal attempts and the current belated motion to reopen the bankruptcy case. *Id.*, at 2–3.

As an initial matter, as noted, this Court finds unconvincing the Debtor's argument that it was only recently apprised of the pursuit of recovery for pre-confirmation conduct. The Debtor was put on notice of the pre-confirmation allegations from the petition (complaint in Louisiana state court) that was filed in *Rozel* on November 8, 2013, which alleged: "**[s]ince 1978 and before**, Defendants' oil and gas activities have resulted in the dredging of numerous canals in, through, and across the Operational Area," and "Plaintiffs allege that most, if not all, of Defendants' operations or activities complained of herein were not 'lawfully commenced or established' **prior to the implementation of the coastal zone management program** [in 1980]." *Rozel* Petition for Damages ¶¶ 25, 29, TA at 407, 409 (emphasis added) (internal citation omitted). Despite Debtor's glib assertion that these claims are "vague and general," these allegations at a minimum gave Debtor ample reason to inquire about the scope of conduct at issue and to seek relief in this Court. *See* Reopen Motion ¶ 13. Further, Debtor's other contention that it relied on the Louisiana Plaintiffs' "expressly disavow[ing] asserting discharged claims" is unpersuasive as the Louisiana Plaintiffs could easily (and reasonably) believe their claims were exempted from discharge by being categorized as an environmental claim protected by Class 3-B

30

of the Plan. *See id.* ¶ 13. The Court therefore faults the Debtor for not asserting discharge as a defense for the past eleven years.

By way of possibly unnecessary piling on, Louisiana Plaintiffs further detail a number of discovery requests in *Rozel* and Reorganized Texaco's responses that indicate that the Debtor was on notice that their pre-confirmation conduct is at issue, such as the Louisiana Plaintiffs' defining the relevant period in their discovery requests as January 1, 1920, through November 8, 2023. *See* Reopen Opp., at 10. And, even if one believed the Debtor was not adequately put on notice by the *Rozel* Petition for Damages or the ensuing discovery process, Debtor was certainly put on notice that Louisiana Plaintiffs were seeking recovery for pre-confirmation conduct when it received the 2018 *Rozel* Report. That report contained numerous references to pre-confirmation conduct, such as the following:

> Texaco discovered the Delacroix Island Field in 1941 and completed the first well for early production in the 8,900 ft. sand in late 1941. . . . By the early 1950's, approximately 35 wells had been drilled in the field. . . . By 1987, fifty-four wells were drilled in the field that Texaco continued to operate.

*Additional Exhibits to Declaration of Victor Marcello*, Dec. 5, 2024, ECF No. 4043–4061, at PA: 0006146–47. Texaco simply could not have justifiably assumed until 2024 that only post-bankruptcy conduct was at issue. *Contra* Reopen Motion ¶ 13.

The cases that the Louisiana Plaintiffs cite as support for refusing to grant unreasonably late motions to reopen are inapposite. Neither of the two primary cited cases involved a motion to reopen on the grounds of enforcing the discharge in Bankruptcy Code Section 524(a), and both opinions noted that other factors also weighed in favor of the objecting parties. *See Redmond v. Fifth Third Bank*, 624 F.3d 793, 799–803 (7th Cir. 2010) (declining to reopen when there was a significant delay and the movant's request for relief lacked facial validity); *Matter of Bianucci*, 4 F.3d 526, 527–29 (7th Cir. 1993) (holding that delay in addition to other factors

counseled against reopening a case to address a lien that debtor failed to avoid that was not

discharged).

Although the *Easley–Brooks* timeliness factor weighs against the Debtor, it does not win

the day because it is outweighed by other compelling reasons to reopen the bankruptcy case. As

stated above, bankruptcy courts have broad discretion to reopen a case and may consider

equitable concerns with an emphasis of substance over technical considerations. *See In re Atari,*

*Inc.*, 2016 WL 1618346, at *4. Here, reopening Reorganized Texaco's bankruptcy case is

appropriate and necessary to provide a prompt decision addressing whether the Plan's discharge

applies to the Louisiana Lawsuits. In fact, at oral argument on December 12, 2024, the Louisiana

Plaintiffs themselves acknowledged that their most preferred outcome would be for the Court to

reopen the case and rule in their favor on the merits of the Discharge Motion. Transcript of Dec.

12, 2024 Hearing at 113, *In re Texaco Inc.*, No. 87-20142 (2024). The Court concludes that

reopening Reorganized Texaco's bankruptcy case is warranted in these circumstances.

4.  Other Arguments Against Reopening by Louisiana Plaintiffs

The Louisiana Plaintiffs also assert that this Court should refrain from reopening this case

and deciding the Reopen and Discharge Motions on grounds of, alternatively, abstention under

28 U.S.C. § 1334, *Burford* abstention, and laches. *See* Discharge Opp., at 25–37; Reopen Opp.,

at 8–9. The Court is unpersuaded by these arguments.

a.  *Abstention under 28 U.S.C. § 1334*

The Court disagrees with the Louisiana Plaintiffs' contention the Court should abstain

from deciding the Reopen and/or Discharge Motions under 28 U.S.C. § 1334.

Bankruptcy courts may abstain from hearing a proceeding "in the interest of justice, or in the interest of comity with [s]tate courts or respect for [s]tate law." 28 U.S.C. § 1334(c)(1). In deciding whether permissive abstention is warranted, courts consider twelve factors:

> (1) the effect or lack thereof on the efficient administration of the estate if a Court recommends abstention, (2) the extent to which state law issues predominate over bankruptcy issues, (3) the difficulty or unsettled nature of the applicable state law, (4) the presence of a related proceeding commenced in state court or other nonbankruptcy court, (5) the jurisdictional basis, if any, other than 28 U.S.C. § 1334, (6) the degree of relatedness or remoteness of the proceeding to the main bankruptcy case, (7) the substance rather than form of an asserted "core" proceeding, (8) the feasibility of severing state law claims from core bankruptcy matters to allow judgments to be entered in state court with enforcement left to the bankruptcy court, (9) the burden [on] the court's docket, (10) the likelihood that the commencement of the proceeding in a bankruptcy court involves forum shopping by one of the parties, (11) the existence of a right to a jury trial, and (12) the presence in the proceeding of nondebtor parties.

*In re WorldCom, Inc. Sec. Litig.*, 293 B.R. 308, 332 (S.D.N.Y. 2003); *Delaware Tr. Co. v. Wilmington Tr., N.A.*, 534 B.R. 500, 512 (S.D.N.Y. 2015) (finding that courts in this district consider twelve factors when determining whether to permissively abstain under Section 1334(c)(1)). When assessing whether to grant abstention, courts may consider one or more of these factors. *See In re MatlinPatterson Glob. Opportunities Partners II L.P.*, 2022 WL 17744002, at *4 (Bankr. S.D.N.Y. Dec. 16, 2022). "It follows that a court need not plod through a discussion of each factor in the laundry lists developed in prior decisions." *Id.* (internal quotation marks omitted). "The movant bears the burden of establishing that permissive abstention is warranted." *Id.* (citing *In re Residential Cap., LLC*, 515 B.R. 52, 67 (Bankr. S.D.N.Y. 2014); *In re Waterscape Resort LLC*, 2013 WL 819748, at *2 (Bankr. S.D.N.Y. Mar. 5, 2013)). Importantly, federal courts have a "virtually unflagging obligation" to exercise jurisdiction given to them, so the abstention determination "begins with a presumption in favor

of the exercise of federal jurisdiction and against abstention." *In re MatlinPatterson Glob.*

*Opportunities Partners II L.P.*, 2022 WL 17744002, at *3–4 (internal citations omitted).

As an initial matter, without needing to address the above-listed factors, the Louisiana

Plaintiffs have applied their abstention doctrine analysis to the incorrect dispute. Instead of

applying the factors to the Reopen or Discharge Motion, the Louisiana Plaintiffs apply them to

the merits of the Louisiana Lawsuits. The issues raised in those lawsuits, in essence whether Pre-

Plan and/or Reorganized Texaco's activities violated SLCRMA, are not before this Court. The

Discharge Motion raises questions related to Reorganized Texaco's bankruptcy, namely the

meaning of this Court's prior orders in this case. If the Court reopens this case and decides the

Discharge Motion, the Louisiana state courts will have a bankruptcy court decision that either

indicates (1) that the Louisiana Plaintiffs' suits were exempted from the discharge, or (2) that

recoveries based on Reorganized Texaco's pre-confirmation conduct are barred by the Plan's

discharge and injunction. The Louisiana Plaintiffs claim that "should the court elect not to

abstain, it would be required to perform the arduous if not impossible task of untangling the

activities and damages of [Reorganized Texaco] that occurred pre and post discharge, as well as

untangling [Reorganized Texaco]'s activities and damages from its co-defendants." Discharge

Opp., at 26. This is simply not true.

Rather, because the motions before this Court turn on bankruptcy law and Texaco's

bankruptcy case, the following factors all weigh against permissive abstention: "the extent to

which state law issues predominate over bankruptcy issues"; "the difficulty or unsettled nature of

the applicable state law"; "the feasibility of severing state law claims from core bankruptcy

matters to allow judgments to be entered in state court with enforcement left to the bankruptcy

court"; and "the degree of relatedness or remoteness of the proceeding to the main bankruptcy

case." *In re WorldCom, Inc. Sec. Litig.*, 293 B.R. 308, 332 (S.D.N.Y. 2003). Again, this Court

need not interpret the complex issues raised in the Louisiana Lawsuits, but rather must construe

this Court's prior orders in Reorganized Texaco's bankruptcy case. In fact, the relevant factors

weigh strongly against abstention because, at some point, a court will need to decide whether the

Louisiana Plaintiffs' claims for pre-confirmation conduct in all twenty-two suits are barred by

this Court's prior order. Deciding this issue in piecemeal fashion during or after each of the

twenty-two suits, and potentially having judgments found to be void, would be wildly inefficient

for Courts and litigants alike. It would undoubtedly benefit all the parties and courts involved for

this Court to decide whether Louisiana Plaintiffs' claims have been discharged and enjoined

before all these suits go to trial. *See Waleski v. Montgomery, McCracken, Walker & Rhoads, LLP*

*(In re Tronox)*, 603 B.R. 712, 726 (Bankr. S.D.N.Y. 2019) (finding that the permissive

abstention factors are focused on "efficient bankruptcy administration").

Lastly as to reopening, the Louisiana Plaintiffs maintain that this case is factually similar

to *Placid Oil Co. v. C.C. Abbitt Farms, LLC* ("***Placid Oil***"), in which a bankruptcy court

abstained from deciding whether the discharge injunction barred state court suits related to oil

wells because it "would require substantial inquiry into facts and deeds and land use," spanning

three decades. Reopen Opp., at 8–9 (citing *Placid Oil Co. v. C.C. Abbitt Farms, LLC*, 561 B.R.

60, 69 (2016)). As Reorganized Texaco responds, however, *Placid Oil* is distinguishable because

the "state-court plaintiff voluntarily dismissed with prejudice the portion of its case seeking

liability for discharged claims, which mooted the adversary proceeding to enforce the discharge,"

and, while the court did affirm the decision to abstain, it did so only as to whether other claims in

the case were barred by the discharge. Reopen Reply ¶ 23. This Court agrees with Reorganized

Texaco's analysis of the case and finds that the *Placid Oil* case is dissimilar to the facts at hand.

Even if this were not true, the Court would exercise its discretion by not abstaining given the

compelling practical reasons to decide the Discharge Motion now.

*b. Burford Abstention*

The Court also rejects the Louisiana Plaintiffs' arguments that are based on the *Burford*

abstention doctrine.

The *Burford* abstention doctrine instructs a federal court to abstain from exercising

jurisdiction when (1) "there are difficult questions of state law bearing on policy problems of

substantial public import" or (2) "the exercise of federal review . . . would be disruptive of state

efforts to establish a coherent policy." *New Orleans Pub. Serv., Inc. v. Council of New Orleans*,

491 U.S. 350, 361 (1989) (internal quotation marks omitted). *Burford* abstention is an

"extraordinary and narrow exception to a federal court's duty to exercise jurisdiction." *Tribune

Co. v. Abiola*, 66 F.3d 12, 17 (2d Cir. 1995) (quoting *Colorado River Water Conservation Dist.

v. United States*, 424 U.S. 800, 813 (1976)).

Courts in this district have identified a number of factors to consider in determining

"whether federal court review would work a disruption of a state's purpose to establish a

coherent public policy on a matter involving substantial concern to the public." *See, e.g., Liberty

Mut. Ins. Co. v. Hurlbut*, 585 F.3d 639, 650 (2d Cir. 2009) (applying the factors). Here, this

Court need not consider these factors because the Louisiana Plaintiffs' arguments are based on

the incorrect premise that Reorganized Texaco is asking this Court to decide the merits of the

Louisiana Lawsuits. As stated above, this Court is not being asked to decide issues relating to

"Louisiana's regulations applicable to oil and gas uses of its coastal zone" or adjudicating any of

the state-law issues to be decided by the Louisiana state courts. *See* Discharge Opp., at 34. This

Court is asked to interpret its own prior orders and decide the bankruptcy-law question of

whether the Louisiana Lawsuits are barred by the Plan's discharge provisions. Once such a

determination is made, assuming the Louisiana Lawsuits go forward, the state courts will decide

those cases' controlling merits issues. Thus, it is simply not true that "[t]he risk of conflicts

between federal and state judicial interpretations of the SLCRMA and its implementing

regulations are substantial." *See* Discharge Opp., at 34.

Thus, this Court declines to abstain on *Burford* abstention grounds.

### c.  Laches

The doctrine of laches often could bar relief in a case where a party waited six years or

more to seek court intervention, but, largely because the motions directly concern the effect of

the Court's prior discharge and injunction orders, laches does not prevent this Court from

deciding the Discharge Motion.

"The doctrine of laches protects defendants against unreasonable, prejudicial delay in

commencing suit." *Zuckerman v. Metro. Museum of Art*, 928 F.3d 186, 193 (2d Cir. 2019)

(internal citations omitted). "A party asserting a laches defense must show that the plaintiff has

inexcusably slept on its rights so as to make a decree against the defendant unfair. Laches . . .

requires a showing by the defendant that it has been prejudiced by the plaintiff's unreasonable

delay in bringing the action." *Id.*

The Louisiana Plaintiffs cannot overcome the reality that the bankruptcy discharge under

Section 524 of the Bankruptcy Code is not an affirmative defense that can be waived, such that

equitable defenses can prevent its assertion. *See, e.g., In re Johns-Manville Corp.*, 552 B.R. 221,

252 (Bankr. S.D.N.Y. 2016); *Meadows v. Hagler (In re Meadows)*, 428 B.R. 894, 906–07 (N.D.

Ga. 2010) ("Both §§ 524(a)(1) and (a)(2) expressly state, however, that their protections with

regard to a discharged debt apply 'whether or not discharge of such debt is waived.' . . . [T]he

Debtor's failure to assert his bankruptcy discharge at an earlier time did not waive its protections and does not estop him from asserting it in this proceeding."). Judge Drain reached the same conclusion in this very case when he held "that neither waiver nor laches apply here given primarily the fact that under the bankruptcy code, the discharge which in a Chapter 11 case benefits not only the debtor but the debtor's creditors and in a solvent case the debtor's shareholders cannot be waived by conduct or even an agreement without proper approval under Section 524 of the bankruptcy code." Transcript of May 28, 2010 Telephone Hearing at 11, *Kling Realty Co. v. Texaco, Inc. (In re Texaco, Inc.)*, No. 87-20142 (2010).

As stated above, although not controlling here, the timeliness factor weighs in favor of the Louisiana Plaintiffs. *See supra* at III. A. 3. It has been clear throughout these cases that the Louisiana Plaintiffs seek remedies for what they assert is massive, cumulative environmental degradation spanning decades. Nevertheless, this Court's deciding the Discharge Motion will advance all parties' and relevant courts' interests by efficiently allowing this Court to interpret its own order in the context of the twenty-two currently pending state court lawsuits. Further, the timing of this Decision will not derail the currently pending March 2025 trial in *Rozel*.

As such, laches does not prevent the Court from deciding the Discharge Motion.

### B. Discharge Motion

#### 1. Legal Standard

Except as otherwise provided in the debtor's plan or the order confirming the plan, Bankruptcy Code Section 1141(d)(1) provides for the discharge of all claims against the debtor that arose pre-confirmation whether or not a proof of claim was filed. 11 U.S.C. § 1141(d)(1). Section 524(a)(2) of the Bankruptcy Code provides that a discharge "operates as an injunction against the commencement or continuation of an action . . . [to] recover . . . any such debt," and the Confirmation Order contained an express injunction disallowing the pursuit of recovery for

38

pre-confirmation claims outside of Texaco's bankruptcy case. *See* 11 U.S.C. 524(a)(2); *see also* Confirmation Order, TA at 349–50. The Bankruptcy Code, in addition to the language in the Texaco Plan in this case, defines a "claim" as follows: "(A) a right to payment (including, without limitation, a guarantee), whether or not such right is reduced to judgment, liquidated, fixed or contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or (B) a right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured." 11 U.S.C. § 101(5); *see* Plan, TA at 15–16 (same). It appears all but certain in the absence of compelling contrary arguments that the Louisiana Lawsuits, to the extent they assert liability for pre-confirmation conduct, constitute "claims" under the Bankruptcy Code and Plan. *See* Discharge Motion ¶ 49–52; *see generally* Discharge Opp. Thus, the controlling question here is whether the "claims" asserted in the Louisiana Lawsuits should be classified, and interpreted, as Class 3-B claims.

"A confirmed plan of reorganization is in effect a contract between the parties and the terms of the plan describe their rights and obligations." *See Ernst & Young LLP v. Baker O'Neal Holdings*, 304 F.3d 753, 755 (7th Cir. 2002) (citing *In re Chicago, Milwaukee, St. Paul and Pacific R. R., Co.*, 891 F.2d 159, 161 (7th Cir. 1989)). As a result, bankruptcy courts "follow[] principles of contract interpretation to interpret a confirmed plan of reorganization." *IQMax, Inc. v. Fusion PM Holdings, Inc.*, 2023 WL 2290815, at *1 (2d Cir. Mar. 1, 2023); *see In re AMR Corp. et al.*, 562 B.R. 20, 28 (Bankr. S.D.N.Y. 2016) (finding that courts apply principles of contract law when interpreting a confirmed plan).

In this case, "the rights and obligations arising under [the] Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflicts law thereof." Plan, TA at 65. "It is axiomatic under New York law . . . that the fundamental objective of contract interpretation is to give effect to the expressed intentions of the parties." *Attestor Cap. LLP v. Lehman Bros. Holdings (In re Lehman Bros. Holdings)*, 2019 U.S. Dist. LEXIS 139185, at *26 (S.D.N.Y. Aug. 16, 2019) (quoting *Lockheed Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011) (internal quotation marks omitted)). "[S]pecific clauses of a contract are to be read consistently with the overall manifest purpose of the parties' agreement. Contracts are also to be interpreted to avoid inconsistencies and to give meaning to all of its terms." *In re AMR Corp.*, 562 B.R. at 29 (quoting *Barrow v. Lawrence United Corp.*, 146 A.D.2d 15, 538 N.Y.S.2d 363, 365 (App. Div. 1989)). "For purposes of interpreting a confirmed chapter 11 plan, . . . [t]he Court-approved disclosure statement . . . may be considered conjunctively with the plan, at least where the disclosure statement may be relied on for purposes of claim and issue preclusion." *Solus Alt. Asset Mgmt. v. Delphi Auto (In re DPH Holdings Corp.)*, 553 B.R. 20, 26 (Bankr. S.D.N.Y. 2016) (citing *In re WorldCom, Inc.*, 352 B.R. 369, 377 (Bankr. S.D.N.Y. 2006)).

In a dispute over the meaning of a plan provision, "the threshold question is whether the contract is ambiguous." *Id.* at 27 (citing *Lockheed Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d at 69). Under New York law, "a contract that is complete, clear, and unambiguous on its face must be enforced according to the plain meaning of its terms." *Utica Mut. Ins. v. Fireman's Fund Ins.*, 957 F.3d 337, 344 (2d Cir. 2020) (quoting *Glob. Reinsurance Corp. of Am. v. Century Indem. Co.*, 91 N.E.3d 1186, 1193 (N.Y. 2017)). Moreover, "[w]hen the contract's language is clear and unambiguous, 'courts should not rewrite the term under the guise of interpretation' nor

40

'redraft a contract to accord with its instinct for the dispensation of equity upon the facts of a given case.'" *In re Wonderwork, Inc.*, 2021 Bankr. LEXIS 3157, at \*13 (Bankr. S.D.N.Y. Nov. 16, 2021) (quoting *In re Dynegy Inc.*, 486 B.R. 585, 590 (Bankr. S.D.N.Y 2013)). "A contract is unambiguous where the contract's terms have a definite and precise meaning, as to which there is no reasonable basis for a difference of opinion." *Barclays Capital Inc. v. Giddens (In re Lehman Bros. Holdings)*, 478 B.R. 570, 586 (S.D.N.Y. 2012), *aff'd sub nom. In re Lehman Bros. Holdings*, 761 F.3d 303 (2d Cir. 2014), and *aff'd sub nom. In re Lehman Bros. Holdings*, 590 F. App'x 92 (2d Cir. 2015) (internal quotation marks and citations omitted). However, where "reasonable minds could differ about the meaning of contractual language, such language is ambiguous, . . . and the court must turn to extrinsic evidence to determine the parties' intent." *In re Lehman Bros. Holdings*, 2019 U.S. Dist. LEXIS 139185, at \*26–27 (citing *In re Motors Liquidation Co.*, 500 B.R. 333, 340 (S.D.N.Y. 2013), aff'd, 578 F. App'x 43 (2d Cir. 2014)).

When faced with ambiguity, courts may use various canons and principles of construction and parol evidence to ascertain the meaning of the text. *See Chai v. Comm'r*, 851 F.3d 190, 217 (2d Cir. 2017) ("[I]f the meaning of the statute is ambiguous, [the court] may resort to canons of statutory interpretation to help resolve the ambiguity."); *In re DPH Holdings Corp.*, 553 B.R. at 32 n. 20 (under New York law, "canons of contract interpretation . . . are only non-dispositive aids to interpretation and should not be used to exclude too readily, as if ignoring guests at a party, the legitimate possible meaning of an agreement"); *New York Univ. v. Factory Mut. Ins.*, 374 F. Supp. 3d 315, 323 (S.D.N.Y. 2019), *aff'd,* No. 20-1093-CV, 2021 WL 3136078 (2d Cir. July 26, 2021), and *aff'd,* No. 20-1093-CV, 2021 WL 3136078 (2d Cir. July 26, 2021) ("New York law recognizes the *expressio unius* canon of contract construction"); *see also In re*

*Delta Air Lines, Inc.*, 381 B.R. 57, 81 (Bankr. S.D.N.Y. 2008) (finding that parol evidence may

be considered only if an agreement is ambiguous).

At all times, a court must "construe the contract 'in a manner that accords the words their

fair and reasonable meaning and achieves a practical interpretation of the expressions of the

parties. Put otherwise, a contract should not be interpreted to produce a result that is absurd,

commercially unreasonable or contrary to the reasonable expectations of the parties.'" *In re DPH*

*Holdings Corp.*, 553 B.R. at 27 (quoting *Greenwich Capital Fin. Prods., Inc. v. Negrin*, 74

A.D.3d 413, 415 (N.Y. App. Div. 1st Dep't 2010) (internal quotations marks and citations

omitted)); *see also Nat'l Union Fire Ins. v. Monarch Payroll, Inc.*, 2016 U.S. Dist. LEXIS

19077, at *30–31 (S.D.N.Y. Feb. 17, 2016) (accord). "The meaning of particular language . . .

should be examined in light of the business purposes sought to be achieved by the parties and the

plain meaning of the words chosen by them to effect those purposes." *SR Int'l Bus. Ins. v. Allianz*

*Ins.*, 343 Fed. App'x 629, 632 (2d Cir. 2009) (internal quotation and citation omitted);

*Mastrovincenzo v. New York*, 435 F.3d 78, 104 (2d Cir. 2008) (the "cardinal principle for

construction and interpretation of . . . all contracts . . . is that the intentions of the parties should

control. Unless otherwise indicated, words should be given the meanings ordinarily ascribed to

them and absurd results should be avoided") (alterations in original); *see also Massachusetts*

*Mut. Life Ins. v. Thorpe*, 260 A.D.2d 706, 709 (1999) ("The most fundamental canon of contract

interpretation, taking precedence over all others, is that primary attention be given to the purpose

of the parties in making the contract.").

## 2.  Parties' Contentions

### a.  *Reorganized Texaco's Discharge Motion*

Reorganized Texaco argues that the Louisiana Lawsuits unlawfully assert pre-

confirmation claims that were discharged in Texaco's bankruptcy case. *See, e.g.,* Discharge

Motion ¶ 48. The Debtor maintains that the Louisiana Plaintiffs' asserted requests for relief in the various lawsuits are for an award of money damages and plainly qualify as "claims" under the Bankruptcy Code's broad definition, and thus are "claims" whose treatment is determined by the Plan, Confirmation Order, and Bar Date Order. *Id.* ¶ 52. The Debtor further contends that under the "relationship test" used by courts within the Second Circuit, the Louisiana Plaintiffs had a pre-confirmation relationship with the Debtor through Debtor's oil and gas activities in the parishes such that the SLCRMA claims in all twenty-two lawsuits arose pre-confirmation, and are subject to the Bar Date Order and the Plan's discharge. *Id.* ¶ 53–57. Reorganized Texaco argues that these pre-confirmation SLCRMA claims are Class 6-A unsecured claims under the Plan, and thus were barred by the Bar Date Order, and discharged and enjoined by the Plan and Confirmation Order. *Id.* ¶ 58–61.

Reorganized Texaco maintains that the Louisiana Plaintiffs' claims do not qualify as Class 3-B environmental claims, which were not discharged and survived the consummation of the Plan as if the Texaco bankruptcy cases had not commenced. *Id.* ¶ 62–65. The Debtor contends that the Plan language defining Class 3-B should be interpreted as *only* inclusive of (a) claims under the 13 Federal Environmental Statutes and (b) claims under state laws that are "analogs" of the 13 Federal Environmental Statutes. *Id.* ¶¶ 66, 68. Specifically, Reorganized Texaco maintains that three canons of interpretation—*ejusdem generis*, *noscitur a sociis*, and the rule against adopting constructions that make contractual language superfluous—compel this reading and result. *Id.* ¶ 68–75. Debtor maintains that its interpretation recognizes the distinct purpose of each "category" of Class 3-B claims, with the so-called catchall provision simply capturing state law analogs of the 13 Federal Environmental Statutes while avoiding the need to list every comparable law adopted by all 50 states. *Id.* ¶ 76.

43

In so contending, Reorganized Texaco relies on *Cnty. of San Mateo v. Peabody Energy Corp. (In re Peabody Energy Corp.)*, 958 F.3d 717, 721–23 (8th Cir. 2020), which construed another plan of reorganization that carved out claims under "Environmental Law" from discharge. *Id.* ¶ 74–75. In that case, the Eighth Circuit held that that the catchall in the plan at issue was informed by the list of ten federal statutes that preceded it and was limited to state statutes with an analogous scope, and Reorganized Texaco argues that this Court should find the same here. *Id.*

The last link in Debtor's analytical chain is its contention that SLCRMA is not an analog of any of the 13 Federal Environmental Statutes, and that Louisiana has adopted other statutes to implement and enforce all or some of the 13 Federal Environmental Statutes, while SLCRMA was not adopted for that purpose. *Id.* ¶ 77–87. Rather, Debtor maintains that SLCRMA was adopted as a state analog of the federal CZMA, and CZMA is not one of the 13 Federal Environmental Statutes. *Id.* ¶ 83–87. Reorganized Texaco further argues that SLCRMA is not an "environmental law" because "SLCRMA's focus lies elsewhere" with the asserted broad intent "to encourage multiple uses of resources and adequate economic growth while minimizing adverse effects of one resource use upon another without imposing undue restrictions on any user." *Id.* ¶ 38 (citing *A Coastal User's Guide to the Louisiana Resources Program* II-2, La. Dep't Nat. Res. (2015), https://data.dnr.la.gov/LCP/LCPHANDBOOK/FinalUsersGuide.pdf, TA at 896). To further support its position that SLCRMA is not an environmental law, Debtor notes that LDNR's Office of Costal Management administers SLCRMA while the Louisiana Office of Conservation handles many other aspects of mineral extraction permitting and the Louisiana Department of Environmental Quality both enforces and issues permits under Louisiana's Clean Water Act and Clean Air Act analogs. *Id.* ¶ 39.

*b.   Louisiana Plaintiffs' Opposition to the Discharge Motion*

In opposition,[5] the Louisiana Plaintiffs argue that their claims were not discharged

because they are covered by language describing Class 3-B of the Plan. Discharge Opp., at 16–

17. They further observe that no language in the Plan, the Disclosure Statement and the Notice of

Confirmation limits the scope of the discharge-exempted environmental claims of state or local

governmental units to only the 13 Federal Environmental Statutes and any state analogs thereof.

*Id.*, at 16–19.

In contending that their SLCRMA claims are environmental and thus exempt from

Texaco's discharge and injunction, the Louisiana Plaintiffs cite the Second Circuit's

characterization of the CZMA as giving "states a key role in environmental regulation by

allowing them to develop their own coastal zone management programs, which are subject to

federal approval by the National Oceanic and Atmospheric Administration ('NOAA') in the

Department of Commerce." *Id.*, at 17 (citing *Town of Southold v. Wheeler*, 48 F.4th 67, 71–72

(2d Cir. 2022), *cert. denied sub nom. Town of Southold, New York v. Rosado*, 143 S. Ct. 1755

(2023)). The Louisiana Plaintiffs also identify specific references to environmental law or

purposes within SLCRMA and the Coastal Use Guidelines. *Id.*, at 17 n. 32.

According to the Louisiana Plaintiffs, the Plan's definition of Class 3-B unambiguously

applies broadly to include environmental claims of state and local government units arising

under their own statutes, rules, and regulations, and is not limited to state analogs of the 13

Federal Environmental Statutes. *Id.*, at 17–18. They further argue that Reorganized Texaco

misapplies the canon *ejusdem generis*, and that the list of thirteen federal environmental statutes

---

[5] This Decision's discussion of parties' contentions relating to the Discharge Motion, Discharge Opp., and
Discharge Reply omits arguments that were addressed above in the Merits of the Reopen Motion section, *see supra*
at III. A. 3., generally relating to Texaco's delay in filing the Reopen Motion, permissive abstention, *Buford*
abstention, and laches.

should inform the "class" or general subject matter of state laws included in the catchall, i.e., the class includes state or local laws that provide environmental remedies rather than being confined to the "analogs" of the 13 Federal Environmental Statutes. *Id.*, at 17–19. Second, the Louisiana Plaintiffs contend that the language in the Bar Date Notice stating that any governmental unit need not file a proof of claim "with respect to a claim relating to the enforcement of environmental protection laws and regulations in accordance with the following **or similar statutes**" clearly implicates federal statutes that are "similar" to the 13 Federal Environmental Statutes as well as broadly "similar" state statutes. *Id.*, at 19. In essence, they criticize Debtor's argument as requiring a nonsensical conclusion "that [the] word 'other' does not actually mean other." *Id.*, at 21.

The Louisiana Plaintiffs also support their contention that SLCRMA is covered by the Plan's Class 3-B with a detailed discussion of the federal CZMA, which Louisiana Plaintiffs argue confers substantial environmental regulatory and enforcement to states. *Id.*, at 20 (citing S. Rep. No. 92-753, at 1 (1972), reprinted in 1972 U.S.C.C.A.N. 4776). Louisiana Plaintiffs note that while CZMA is not listed as one of the 13 Federal Environmental Statutes, the "notion that CZMA and SLCRMA operate in a vacuum" is unsupported as even some of the 13 Federal Environmental Statutes require compliance with the CZMA. *Id.*

Finally, the Louisiana Plaintiffs maintain that *In re Peabody Energy Corporation* is inapposite for two main reasons. *Id*. First, the environmental law carveout in *Peabody* was worded differently such that the language was not analogous to Texaco's Plan. *Id.* And, second, the municipalities in *Peabody* (unlike the Louisiana Plaintiffs) were also asserting common-law claims as "state and local equivalents" of the listed federal statutes, but those were clearly tort

claims that did not benefit from the plan's preservation of claims under environmental statutes. *Id*.

### c. Reorganized Texaco's Reply

In reply, Reorganized Texaco correctly notes that there is little if any dispute that the claims in the Louisiana Lawsuits based on the Debtor's pre-confirmation conduct constitute "claims" under the Bankruptcy Code. Discharge Reply ¶ 2. The Debtor reiterates its argument that Class 3-B is limited to claims under the 13 Federal Environmental Statutes and state analogs thereof because the list of the 13 Federal Environmental Statutes does not include the CZMA and because, in Debtor's view, the second clause of the definition of Class 3-B in the Plan is a "catchall" that must limited in scope to the examples that come before it, namely the 13 Federal Environmental Statutes. *Id*. ¶¶ 4, 9–12. The Debtor further maintains that it is irrelevant whether Louisiana Plaintiffs claim that CZMA is "more" environmental than certain of the 13 Federal Environmental Statutes based on Debtor's theory that the Plan's definition of Class 3-B does not encompass claims that arise under all purported environmental statutes. *Id*. ¶ 17. Debtor further objects that the Louisiana Plaintiffs' reading wrongly equates "other" with "any and all." *Id*. ¶ 18.

Lastly, the Debtor argues that CZMA is neither listed among nor similar to the 13 Federal Environmental Statutes for a variety of reasons discussed below. *Id*. ¶ 19–23.

Finally as to the parties' contentions, it also bears mention that when a contract is ambiguous, the Court can consider parol evidence of the parties' understanding and intent at the time of drafting. *Cf. In re DPH Holdings Corp.*, 553 B.R. at 35–36 (concluding that the proper course on summary judgment motions on the interpretation of ambiguous plan provisions was to develop a factual record using parol evidence). However, neither the Debtor nor the Louisiana Plaintiffs identified parol evidence beyond the case's formal record despite inquiry by the Court

during oral argument. There accordingly was no need for the Court to conduct an evidentiary
hearing on the Discharge Motion.

### 3.   Merits of the Discharge Motion

It is undisputed that claims that fall within "Class 3-B" under the Plan are excluded from
the Plan's and Confirmation Order's discharge and injunction provisions. The parties' dispute
therefore boils down to determining the meaning and applicability of the Plan's definition of
"Class 3-B" claims. The confirmed Plan describes that class of claims as follows:

> Unsecured Claims of the United States of America and other state and local
> governmental units arising under the statutes set forth on Exhibit "6" attached
> hereto and incorporated herein by reference and under other environmental
> protection legislation, rules or regulations enacted, adopted or promulgated by
> states or subdivisions thereof.

Plan, TA at 35–36. The Court denies the Discharge Motion because the Louisiana Lawsuits
present environmental claims that fall within the Plan's definition of Class 3-B claims. The
reasons for this conclusion are detailed below, but, by way of summary, the Louisiana Plaintiffs
are local and state governmental units that are asserting claims for monetary and possibly other
relief based on alleged violations of a Louisiana statute and associated regulations that the
Louisiana Plaintiffs contend impose liability and provide remedies for pre-bankruptcy Texaco's
alleged causation of widespread environmental contamination and land loss through decades of
activity in Louisiana. Try as Reorganized Texaco might to show otherwise, these claims fall
squarely within the Class 3-B definition of environmental claims that are not discharged or
enjoined under the Plan. This is consistent with the Plan's purpose and objectives: the Plan and
associated documents were urgently and expressly aimed at resolving the enterprise-threatening
Pennzoil judgment. At the time of confirmation and throughout the case, the Debtor made clear

that its environmental liability exposures and obligations were beyond the scope and purpose of

its bankruptcy case and would be left unaffected by the bankruptcy.

Meanwhile, Reorganized Texaco's contrary reading of the Plan is unduly cramped and

unpersuasive—in essence a misplaced insistence that a handful of judicially recognized canons

of interpretation are the sole available tools for reading the Plan and, further and inaccurately,

that those canons dictate a contrary result.

        a.   The Plain Language and Unambiguous Meaning of the Plan's
             Class 3-B Definition Applies to the Louisiana Plaintiffs'
             Claims

Before turning to any other means of interpreting the Plan's language, the Court first

considers "whether the contract is ambiguous," *In re DPH Holdings Corp.*, 553 B.R. at 27,

because "a contract that is complete, clear, and unambiguous on its face must be enforced

according to the plain meaning of its terms." *Utica Mut. Ins. Co.*, 937 F.3d at 344. For this

standard to be met, the contract's terms must have a "definite and precise meaning" as to which

"there is no reasonable basis for a difference of opinion." *Barclays Capital Inc.*, 478 B.R. at 586.

The Court concludes that the Louisiana Plaintiffs' claims fall within the unambiguous meaning

of the Plan's Class 3-B definition, and the Court's analysis could stop there, although, as

discussed below, that conclusion finds further reinforcement if one looks beyond the express, on-

point Plan language.

As a threshold matter, and as appears uncontested, the Louisiana Plaintiffs are

governmental units organized under the laws of the State of Louisiana such that they are among

the state and local governmental parties covered by the Plan's Class 3-B. *See* Plan, TA at 35–36.

The controlling question thus is whether their asserted claims in the Louisiana Lawsuits

arise "under other environmental protection legislation, rules or regulations enacted, adopted or

promulgated by states or subdivisions thereof." Plan, TA at 35–36. The answer to this question

requires consideration of the law under which their claims are brought, an analysis that is further

informed by the nature of the claims and remedies sought in the Louisiana Lawsuits, all of which

are brought exclusively pursuant to SLCRMA and related state regulations.

SLCRMA, the governing statute, is not exclusively devoted to environmental protection

or remediation, but encompasses environmental regulation and harm avoidance, and provides for

court imposition of remediation requirements and remedies such as fines and penalties. As stated

in the Background section, SLCRMA established a Louisiana state regulatory regime enacted

pursuant to the federal Coastal Zone Management Act, which authorized states to develop

coastal management programs. *See supra* at I. B.; 16 U.S.C. §§ 1451, 1452. SLCRMA requires

individuals and businesses wishing to conduct "any use or activity within the [Louisiana] coastal

zone" to obtain a permit, with the LDNR through the Office of Coastal Management, which, in

deciding whether to grant a permit, balances the anticipated benefits of proposed uses and

economic development in the area with the need to protect and restore the coastal region. *See* La.

Rev. Stat. §§ 49:214.30, 49:214.26, 49:214.22. The Second Circuit has recognized the

environmental aspects of the CZMA regime, characterizing the CZMA as "giv[ing] states a key

role in environmental regulation by allowing them to develop their own coastal zone

management programs." *Town of Southold v. Wheeler*, 48 F.4th 67, 71–72 (2d Cir. 2022) (citing

16 U.S.C. § 1455(d)). Subsection (36) of SLCRMA provides for environment-focused

enforcement of the statute, including courts' ability to impose civil liability, order the payment of

restoration costs, and require actual restoration of disturbed areas. *See* La. Rev. Stat. §

49:214.36(E).

Although Reorganized Texaco is correct that SLCRMA also covers things like land use

and economic development, those features of the law do not negate or render irrelevant the

environmentally focused aspects of the law. SLCRMA explicitly states its statutory purpose and requirements as mandating, in conjunction with the weighing of benefits of proposed activities, the simultaneous consideration of environmental protection and maintenance. *See* La. Rev. Stat. § 49:214.22(5). Further, Louisiana's Coastal Use Guidelines issued under SLCRMA concerning oil and gas activities require that "[d]rilling and production sites shall be prepared, constructed, and operated using the best practical techniques to prevent the release of pollutants or toxic substances into the environment." La. Admin. Code tit. 43, pt. I, §§ 719(D), (E). Throughout the statute, there are many references to environmental considerations. *See generally* La. Rev. Stat. §§ 49:214.21 *et seq.* The statute cannot be read as being unconcerned with environmental protection and remediation merely because it also serves purposes of land use management and facilitation of appropriate economic or other activity. *Cf., e.g.*, Executive Order 13563, 76 Fed. Reg. 3821 (Jan. 21, 2011) (requiring federal agencies (including the EPA) to quantify anticipated benefits and costs of proposed rulemakings and to reduce the burden of regulation; "[o]ur regulatory system must protect public health, welfare, safety, and our environment while promoting economic growth, innovation, competitiveness, and job creation"; agencies are to select, "in choosing among alternative regulatory approaches, those approaches that maximize net benefits (including potential economic, environmental, public health and safety, and other advantages)").

In fact, one of Reorganized Texaco's asserted examples of how "SLCRMA's focus lies elsewhere" cuts in favor of the Louisiana Plaintiffs. Reorganized Texaco notes that SLCRMA incorporates requirements from separate environmental statutes such as the Clean Air Act and further objects that the obligations and monetary grants provided under CZMA are inapplicable in states that do not adopt an appropriate coastal management program. *See* Discharge Motion ¶

34–38; Discharge Reply ¶ 19–23. But the fact that state-enacted laws and plans under the CZMA

umbrella incorporate environmental protection laws shows that those state regimes, like

SLCRMA, *do* serve environmental purposes. Nor is SLCRMA made non-environmental by the

fact that CZMA authorizes federal grants to support participating states' implementation of a

coastal management program. Rather, the provision of federal funds incentivizes states to adopt

an approved program to maintain the state's coastal zone and enforce the requirements set forth

in CZMA, and this process includes consideration and appropriate protections for the

environment.

Further, although Louisiana Plaintiffs did not develop the argument, SLCRMA includes

environmental requirements that are similar to at least one of the enumerated 13 Federal

Environmental Statutes, namely, the Comprehensive Environmental Response, Compensation

and Liability Act ("**CERCLA**"), 42 U.S.C. §§ 9601 *et seq*. CERCLA was enacted in 1980, and

authorized the Hazardous Substance Superfund Trust Fund to fund remediation of sites for which

there are no financially viable parties who can satisfy the liability, with the trust funded under the

Internal Revenue Code by a tax scheme upon crude oil, imported petroleum products, and

domestic chemical feedstocks, among others. *See* 26 U.S.C. §§ 4611, 4661. CERCLA—a

quintessential federal environmental statute—includes remedial provisions much like

SLCRMA's, including authorizing the EPA to issue administrative orders or pursue judicial

orders to require responsible parties to perform cleanup of areas impacted by the release of

contaminants and seek recovery for cleanup costs, among others. *See* 42 U.S.C. §§ 9606(a),

9607(a). CERCLA also includes "natural resource damage" provisions that, much like the

Louisiana Plaintiffs' land restoration claims under SLCRMA, can lead to a requirement to fund

or carry out restoration efforts to alleviate natural resource damages associated with a defendant's activities. *See generally* 42 U.S.C. § 9607(f); 43 C.F.R. pt. 300.

Thus, the environmental nature of SLCRMA and its regulations is unambiguous, but this reading also is borne out by consideration of the Louisiana Lawsuits, which are based entirely on SLCRMA and regulations under it, and which allege and seek relief for "environmental" harms allegedly caused by Texaco, both before and after its bankruptcy. The "environmental" harms asserted by Louisiana Plaintiffs include damages caused by Debtor's oil and gas activities in the form of land loss and contamination. Discharge Motion ¶ 41. The relief requested—again, all pursuant to and consistent with SLCRMA—includes payment of "costs necessary to clear, revegetate, detoxify and otherwise restore" the areas at issue, and actual restoration of the coastal zone. *Rozel* Petition for Damages, TA at 414. These are quintessentially environmental claims, brought under SLCRMA. It is hard to see how a law with features like SLCRMA's that supports claims like those of the Louisiana Plaintiffs here could be anything other than state-promulgated environmental legislation and/or regulations. Of course, whether the Louisiana Plaintiffs' claims are legally sufficient and proven at trial remains to be determined by the Louisiana courts, but— with the claims having survived more than a decade of pretrial litigation and having advanced to the cusp of trial—one cannot help but conclude that the governing statutory regime is an "environmental" law that permits monetary damage and remediation claims in response to alleged environmental harms.

      b.  <u>The Plan as a Whole, Its Purposes and Evident Intentions, and the History of Its Development Are Consistent with the Unambiguous Applicability of the Class 3-B Definition</u>

The unambiguous meaning of the Plan's Class 3-B definition alone could control, but, even if it did not, that reading is confirmed by consideration of the Plan as a whole, the purposes that it serves, and the history of its development and drafting. *See Mastrovincenzo*, 435 F.3d at

104 (the "cardinal principle for construction and interpretation of . . . all contracts . . . is that the

intentions of the parties should control"); *SR Int'l Bus. Ins. v. Allianz Ins.*, 343 Fed. App'x 629,

632 (2d Cir. 2009) (the "meaning of particular language . . . should be examined in light of the

business purposes sought to be achieved by the parties and the plain meaning of the words

chosen by them to effect those purposes") (internal quotation and citation omitted).  As this

Court has recognized, "specific clauses of a contract are to be read consistently with the overall

manifest purpose of the parties' agreement." *In re AMR Corp.*, 562 B.R. 20, 29 (Bankr. S.D.N.Y.

2016) (quoting *Barrow v. Lawrence United Corp.*, 538 N.Y.S.2d 363, 365 (App. Div. 1989)).

First, the Plan, standing alone, clearly evinces the intention to reserve for another day

environmental claims, without consideration of or exception as to any state's or locality's

possible claims or regulatory concerns arising from Texaco's long history of pre-bankruptcy

energy production. Nothing in the Plan says or suggests that any type of state or local

governmental environmental claims are not preserved, nothing in the Plan details or provides for

any particular treatment of any type of state or local governmental entity environmental claims,

and nothing in the Plan expressly limits the open-ended wording of Class 3-B as to

environmental claims of states and localities.

This is in keeping with the origins, history, and purpose of Texaco's bankruptcy case.

Texaco itself described its bankruptcy's overarching purpose and context as "provid[ing] Texaco

with additional time to seek a reasonable settlement of the [Pennzoil] controversy," which

otherwise threatened to cripple the company, and after that settlement the company sought a

swift exit from bankruptcy. Disclosure Statement, TA at 145; *see also In re Texaco Inc.*, 254

B.R. 536, 541–42 (Bankr. S.D.N.Y. 2000); *see also generally* Disclosure Statement, TA at 141–

45 ("In Texaco's opinion, this was the only viable means by which Texaco could pursue its

appeal of the Pennzoil judgment" and prevent Pennzoil from "seiz[ing] and sell[ing] Texaco's

assets" pending appeal.). Meanwhile, it was important for Pre-Plan Texaco not to get bogged

down in protracted bankruptcy proceedings, so that it consciously chose to avoid the morass of

trying to resolve its many environmental issues: as it said in its Disclosure Statement, Texaco

excluded the EPA's and other agencies' environmental claims so as to "avoid delaying these

[bankruptcy cases] to resolve any potential dispute over [these] issues." Disclosure Statement,

TA at 160. Like many energy companies, Pre-Plan Texaco was subject to longstanding

regulatory inquiry and environmental liabilities, as acknowledged in the Disclosure Statement.

*Id.* ("Agencies of the United States, including the . . . [EPA], presently have certain lawsuits

pending against Texaco under federal environmental laws."). Given that Pre-Plan Texaco was

"unable to estimate with any degree of certainty the amount of liability, if any, in respect of

'Environmental Claims,'" Reorganized Texaco created Class 3-B and allowed environmental

law claims arising thereunder to survive the bankruptcy unaffected by the discharge. *Id.* In fact,

Pre-Plan Texaco explicitly stated that "following confirmation of the Plan, other environmental

actions or proceedings arguably arising from Texaco's pre-petition acts may be asserted against

Texaco." *Id.*

The Disclosure Statement, a Court-approved document that Texaco used to solicit

acceptances of the Plan which all creditors and parties in interest were urged to read "with care,"

contains many other passages to the same effect. *See* Disclosure Statement Order, TA at 132. It

described and defined Class 3-B as follows: "[t]he Plan does not impair the Claims of the United

States Department of Energy (the 'DOE') and *the claims of any governmental unit arising*

*under any environmental legislation* (the 'Environmental Claims')." Disclosure Statement, TA

at 140 (emphasis added). The Disclosure Statement further stated that "[t]he Environmental

Claims relate to any Claims which have been or may be asserted by any governmental unit arising under various federal *or similar* statutes regarding environmental protection and related legislation, rules and regulations." *Id.*, TA 160 (emphasis added). Again, these statements are unaccompanied by any suggestion that the scope of the Class 3-B carveout was limited. Similarly, the Bar Date Order and Bar Date Notice also contained broad language describing Class 3-B: "enforcement of environmental protection laws and regulations in accordance with the following *or similar* statutes." Bar Date Order, TA at 4–5; Bar Date Notice, TA at 9–10 (emphasis added). This definition too appears elastic and unqualified, and nowhere suggests that any governmental unit's environmental claim would be subject to the Bar Date or, by extension, to the Plan's discharge or injunction.

Further, like almost all plans of reorganization in voluntary Chapter 11 cases, the Plan was developed and proposed by the Debtor, albeit doubtless with input from other constituencies. If the Debtor wanted a less open-ended preservation of state environmental claims, it easily could have used more specific wording. To the extent the open-ended wording concerning the types of state claims excepted from discharge created ambiguity, the Debtor who drafted the provision should not benefit from a new, restrictive reading of its own elastic wording. *Cf. McCarthy v. Am. Int'l Grp.*, 283 F.3d 121, 124 (2d Cir. 2002) ("New York follows the well established *contra proferentem* principle which requires that equivocal contract provisions are generally to be construed against the drafter.") (internal citations omitted).

In the face of this overwhelming evidence that Texaco's bankruptcy aimed at not canvassing, detailing, or resolving what the company understood to be wide-ranging environmental liability exposures, and instead prioritized surgically resolving its Pennzoil dispute and swiftly exiting bankruptcy, Reorganized Texaco's Discharge Motion and the reading

it now advances is contrary to the realities of the bankruptcy case that spawned the Class 3-B definition. Their proposed reading cannot be squared with the requirement that "specific clauses of a contract are to be read consistently with the overall manifest purpose of the parties' agreement." *In re AMR Corp.*, 562 B.R. at 29; *see also SR Int'l Bus. Ins. Co.*, 343 Fed. App'x at 632.

Thus, although the Plan language defining Class 3-B is unambiguous and does not require additional reinforcement, the language contained in the supporting documents coupled with the circumstances and purposes of Texaco's bankruptcy point in the same direction. In other words, both the Plan's literal terms and the Plan's context and purpose reveal that the Plan's discharge and injunction provisions do not bar the Louisiana Lawsuits.

c.    <u>Reorganized Texaco's Arguments Based on Canons of<br>Construction Are Misplaced</u>

Given the Plan's unambiguous meaning and clear purposes, Debtor's resort to various interpretive canons does not persuade.

Reorganized Texaco relies heavily on the "*ejusdem generis*" canon of construction, which it contends limits the state-law claims classified in Class 3-B to claims under the state-law analogs of the 13 Federal Environmental Statutes. Discharge Motion ¶¶ 70, 72. But this contention misapplies the *ejusdem generis* canon, and, even if that were not so, the contention would not overcome the plain-language and business-purpose considerations described above. *See In re DPH Holdings Corp.*, 553 B.R. at 32 n. 20 (Under New York law, "canons of contract interpretation . . . are only non-dispositive aids to interpretation and should not be used to exclude too readily, as if ignoring guests at a party, the legitimate possible meaning of an agreement").

The principle of *ejusdem generis* posits that "a general or collective term at the end of a list of specific items is typically controlled and defined by reference to the specific classes . . . that precede it." *Fischer v. United States*, 603 U.S. 480, 487 (2024) (internal quotations and citations omitted). By way of illustration drawn from *Fischer*, the court held that the scope of the "otherwise" provision in 18 U.S.C. § 1512(c)(2) was defined by the specifically enumerated conduct outlined in § 1512(c)(1) such that the conduct included in the "otherwise" provision was limited to conduct that impaired the integrity or availability of records, documents, or objects for use in an official proceeding.[6] *Id.* at 487–89. Thus, a "catchall must be interpreted in light of its surrounding context and read to embrace only objects similar in nature to the specific examples preceding it." *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204, 217 (2024) (internal citations omitted). In essence, the rule seeks to limit what otherwise could be unbounded elastic readings of "catchall" provisions appearing at the end of a statutory lists to the general meaning or topic evidenced by the more specific preceding entries in the statutory list. *Cf. id.* In the recent *Purdue Pharma* decision, for example, the U.S. Supreme Court termed Section 1123(b)(6) a "catchall" provision and deemed it limited to matters of the general type evidenced in the preceding five subsections. *Id.* at 215–19 (interpreting the catchall of "any other appropriate provision not inconsistent with the applicable provisions of this title" as not so broad as to authorize nonconsensual non-debtor releases when the preceding five specific examples concerned the rights and responsibilities of the debtor in relation to creditors).

Reorganized Texaco compares the Plan's Class 3-B definition to Section 1123(b)(6) of the Bankruptcy Code, as construed by the Supreme Court in *Purdue Pharma*. Discharge Motion

---

[6] The relevant provisions in 18 U.S.C. § 1512(c) are as follows: "Whoever corruptly—(1) alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or (2) otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so, . . . shall be fined . . . or imprisoned not more than 20 years, or both."

¶ 69. But the two passages materially differ, eliminating any possible force behind Reorganized Texaco's argument.

Section 1123(b)(6) is the final entry in a list of numbered statutory subsections of Section 1123(b), identifying permissible characteristics of plans of reorganization. The first five subsections are relatively targeted and, according to the Supreme Court, debtor-focused, while the sixth allows "any other appropriate provision not inconsistent with the applicable provisions of this title." *Id.* at 215–19. Although this wording is open-ended, the Supreme Court held that it does not authorize nonconsensual non-debtor releases because subsection six, as the final entry in an enumerated list, must be construed in light of and limited by the more specific entries that preceded it. *Id.*

The operative Plan language in this case is not a true "catchall," nor is it the type of "general or collective" term within a list that *ejusdem generis* limits. *See Fischer*, 603 U.S. at 487. Rather, the Plan's Class 3-B definition is not formatted as a list, nor is it grammatically the equivalent. The Plan's Class 3-B definition covers two separate and independent sets of claims, the first being claims of federal or state governments under specified federal environmental laws, and the second—grammatically separate thanks to the use of the conjunctive "and" after the explanation of the first, federal-statute-based set—allowing governmental units to pursue claims under "other environmental protection legislation, rules or regulations" that were enacted or promulgated by states or state subdivisions. *See* Plan, TA at 35–36. This clause is grammatically separate and not styled or positioned to be a culminating entry number 14 at the end of the list of the 13 Federal Environmental Statutes. Rather, the Plan preserved claims arising under the specified, enumerated list of federal statutes, and then separately and equally preserved governmental claims arising under an undefined set of "other" state environmental laws. The

clause also is not a limitless or overbroad catchall, but rather is specifically limited to claims that (1) arise under environmental protection laws, rules and regulations, that (2) were enacted, adopted or promulgated by states or subdivisions thereof. This textual specificity means that the clause regarding state law-based claims is not the broad "and others" type of clause that *ejusdem generis* counsels to limit. Further, even using *ejusdem generis* to "interpret[] [the clause] in light of its surrounding context," the state law portion of the definition is limited to publicly promulgated environmental laws, and thus does not impermissibly stray from the topic of the preceding or adjoining text. *See Purdue Pharma*, 603 U.S. at 217.

Further, there is no textual or logical basis—nor any basis that Reorganized Texaco has identified in the Plan's text, structure, drafting history, or stated purposes—to construe the preserved universe of state-law claims to "analogs" of the enumerated list of federal statutes. Rather, the definition reflects the reality that the Plan was drafted to permit resolution of the Pennzoil judgment and a swift exit from bankruptcy, while leaving both known and unknown environmental issues for another day.

Also, as is discussed in greater detail *supra* at III. B. 3. a., even if that were not so, Reorganized Texaco fails to recognize that SLCRMA is "similar" or "analogous" to at least one of the 13 Federal Environmental Statutes, specifically, the Natural Resource Damage provisions of CERCLA, 42 U.S.C. § 9607(f); 43 C.F.R. pt. 300, such that Reorganized Texaco's motion would not prevail even if the Court agreed with Texaco's proposed method of interpreting the Plan's language.

Finally as to *ejusdem generis*, Reorganized Texaco's reliance on an Eighth Circuit decision, *In re Peabody Energy Corp.*, 958 F.3d 717 (8th Cir. 2020), is misplaced. The Debtor correctly notes that there was a "catchall" in the text defining a class of environmental claimants

in the case of *In re Peabody Energy Corp.*, which Debtor "cited . . . to demonstrate that the

*noscitur a sociis* and *ejusdem generis* canons of construction apply to the interpretation of a

catchall in a chapter 11 plan." Discharge Reply ¶ 16 n. 8. The Debtor also noted that the Eighth

Circuit in *Peabody* held that that the catchall in that case was informed by the list of ten federal

statutes that preceded it and was limited to state statutes with an analogous scope, and that this

Court should find the same. Discharge Motion ¶ 74–75. But Debtor disregards a fundamental

difference between the language at issue in its case and the language that *Peabody* construed: in

*Peabody*, the language concerning state statutes was explicitly limited to "equivalents" of

previously listed federal statutes ("any state or local equivalents of the foregoing"), 958 F.3d at

721,[7] whereas here, the Plan included no such limitation. If the purported "catchall" clause in this

case merely stated "any state or local equivalents of the foregoing," then the 13 Federal

Environmental Statutes would undoubtedly limit the state and local laws included in Class 3-B to

analogs of the enumerated federal laws. But no such limiting language appears.

Moreover, in *In re Peabody Energy Corp.*, the court further noted that the plan's

preservation of claims used "including without limitation" language that "could reasonably mean

that there might be more environmental statutes of a similar scope that could be considered

Environmental Laws," but "not that any claim with a potential environmental reach is carved

out," such that the Court rejected the proposed inclusion of state-law nuisance in this class. 958

F.3d at 723. But Class 3-B in Texaco's Plan is limited to claims of state and local governments

under state "environmental protection" laws, Plan, TA at 35–36, thus not running afoul of the

caution in *Peabody* not to construe a list of applicable laws so broadly as to capture nuisance

---

[7] *Peabody* concerned a plan's definition of environmental claims as those arising under "all federal, state and local statutes, regulations and ordinances concerning pollution or protection of the environment, or environmental impacts on human health and safety, including [ten federal statutes] ***and any state or local equivalents of the foregoing***." (emphasis added).

claims. Even more fundamentally, the drafting of Class 3-B here does not present a "catchall" or

a textual requirement that preserved state-law claims be determined by reference to analogous

federal statutes.

In addition to its reliance on *ejusdem generis*, Reorganized Texaco invokes two other

interpretive canons or principles, *noscitur a sociis* and the rule against interpreting texts in a way

that makes a word or clause superfluous. These contentions fare no better.

Under the similar but distinct canon of *noscitur a sociis*, words are "given more precise

content by the neighboring words with which it is associated." *United States v. Williams*, 553

U.S. 285, 294 (2008). "It is particularly useful when interpreting 'a word [that] is capable of

many meanings.'" *Fischer*, 603 U.S. at 509 (citing *McDonnell v. United States*, 579 U.S. 550,

569 (2016) (internal citations omitted)); *see, e.g.*, *Gustafson v. Alloyd Co.*, 513 U.S. 561, 573–

575 (1995) (employing the canon to interpret "communication" in the statutory list "prospectus,

notice, circular, advertisement, letter, or communication"). Using this canon, Reorganized

Texaco argues that the list of 13 Federal Environmental Statutes "confines" the "catchall" clause

to state laws that "implement and enforce all or a part of" the 13 Federal Environmental Statutes.

Discharge Motion ¶ 75.

In a similar vein to the preceding analysis on *ejusdem generis*, this argument fails as the

Debtor misapplies the canon. The supposed "catchall" clause actually provides a workable, free-

standing, and specific statement of what it covers, grammatically separate from the definition's

list of the 13 Federal Environmental Statutes, and does not present a "word [] capable of many

meanings" that appears as part of a single list. *See Fischer*, 603 U.S. at 509 (internal citations

omitted). Again, what Debtor terms a "catchall" clause is topically related to the preceding

clause in that it includes environmental laws, but it is unrelated or dissimilar in that it addresses

the treatment of claims arising under state laws (a large and difficult-to-enumerate universe given the many states and localities in which Texaco operated) rather than federal laws. The clause should not be read to limit the class to only including state laws promulgated as a state analog of the 13 Federal Environmental Statutes, as this interpretation reads words into the text that simply are not present.

The final rule of construction that Debtor emphasizes is that texts should not be construed in a way that renders a "clause, sentence, or word" "superfluous, void, or insignificant." *Duncan v. Walker*, 533 U.S. 167, 174 (2001) (internal citations omitted); *see also Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 86 (2d Cir. 2002) (explaining that courts "disfavor contract interpretations that render provisions of a contract superfluous"). The Class 3-B definition does not do so. Reorganized Texaco argues that the word "other" modifies "environmental protection legislation" and, further, that that term refers back to the 13 Federal Environmental Statutes. Discharge Motion ¶ 75. As a result, Debtor concludes that the "catchall" cannot possibly encompass all environmental laws enacted by states or their subdivisions because "that would render the word 'other' and the Plan's labeling of the Specified Environmental Laws as 'Environmental Laws' superfluous." *Id.* Not so. While "other" does indeed modify the state "environmental protection legislation" that gives rise to preserved claims of states and their instrumentalities, as discussed above, that term does not limit protected state-law claims to analogs of the 13 Federal Environmental Statutes. The "other" here indicates that there are distinct and different environmental statutes—state statutes—that are also included in Class 3-B. In other words, "other" means other and is not superfluous.

### d.  Other Arguments

Other arguments by both parties can be dealt with swiftly.

63

First, the Debtor argues that the Plan was developed as a result of negotiations between the Debtor and EPA and other federal agencies, and that those entities would have insisted on inclusion of CZMA on the list of 13 Federal Environmental Statutes if the Plan intended to preserve such claims. *See* Discharge Reply ¶ 23 (citing Disclosure Statement, TA at 160). But neither the EPA nor other federal agencies bring actions under CZMA, so there is no self-interested reason for those entities to have insisted on including the CZMA on the list of preserved federal-law claims, and meanwhile, there is no reason for the Class 3-B definition to have singled out state-law regimes adopted under the auspices of the CZMA because the broad preservation of state-law environmental claims already covered those regimes. The reasonable conclusion is that Texaco gave a broad carve-out preserving whatever governmental environmental remedies existed under state statutes and regulations so that Texaco could swiftly exit bankruptcy and put the enterprise-threatening Pennzoil judgment behind the company.

Second, given the Court's determination that their claims are preserved by operation of Class 3-B of the Plan, the Court need not decide the Louisiana Plaintiffs' underdeveloped suggestion that their claims may be entitled to non-discharged administrative status.

Finally, in light of the Court's holding, the Court need not resolve the following arguments that the parties' briefs largely consigned to footnotes: (1) that the remedies for claims asserted in the Louisiana Lawsuits are administrative claims for which the Plan imposed no bar date, Discharge Opp., at 24 n. 45; Discharge Reply ¶ 10 n. 3; (2) that the Parish entities of the Louisiana Plaintiffs did not receive actual notice of the bar date because the Bar Date Notices were not sent to Parish District Attorneys, Police Juries, Parish Presidents, or Parish Councils, Discharge Opp., at 12 n. 29; Discharge Reply ¶ 10 n. 4; and (3) particularly unpersuasively, that Louisiana Plaintiffs' claims for pre-confirmation conduct were not discharged even if such

claims are categorized as Class 6-A unsecured claims because Class 6-A claims were

unimpaired, Discharge Opp., at 21 n. 40; Discharge Reply ¶ 10 n. 5. Arguments set forth only in

footnotes may be disregarded and may be deemed to not have been properly raised or preserved.

*Cf.  United States v. Svoboda*, 347 F.3d 471, 480 (2d Cir. 2003) (arguments made only in

footnotes are not considered "adequately raised or preserved for appellate review") (internal

citations omitted). But even if this were not so, the arguments need not be addressed further

because they are unnecessary to the Court's decision and do not bear on the Court's analysis of

the Class 3-B definition.

## IV.    CONCLUSION

For the reasons stated above, Reorganized Texaco's motion to reopen the case is

GRANTED for the sole purpose of permitting this Court to determine whether the confirmed

Plan precludes the Louisiana Plaintiffs' pursuit of their pending state-court actions, while

Texaco's motion to enforce the discharge and Plan injunction is DENIED.

The parties are to settle an order to effectuate and memorialize this decision. The time

to appeal will run from the entry of such an order. If there is no further reason to keep the newly-

reopened case open, the parties shall so state, either in the text of the proposed order they submit,

or otherwise.

It is SO ORDERED.

Dated:    New York, New York
          February 21, 2025            _____
                                              */s/ David S. Jones*
                                       HONORABLE DAVID S. JONES
                                       UNITED STATES BANKRUPTCY JUDGE